JOHN J. RILEY v. ROBERT A. CONNER ET AL.

*Chattel mortgages—Release of portion of property—Estoppel—Evidence.*

1. Silence by a mortgagee who is present when a bill of sale of the mortgaged property is read, in which a portion of the property is reserved by the vendor (mortgagor), and in which the vendee assumes the payment of the mortgage debt, will not amount to a consent to a release of the reserved property from the mortgage, nor estop him from thereafter enforcing its lien thereon.

2. Where a mortgagee claims the possession of a *portion* of the mortgaged property because of an alleged attempt of the mortgagor to dispose of it contrary to the condition of the mortgage, and in a suit brought by the mortgagor for its recovery it appears that the mortgagee assented to the sale by the mortgagor of the *balance* of the property, it is error for the court to instruct the jury, generally, that such consent was a waiver of said condition, without calling attention to the claim of the mortgagee as to the alleged attempt of the mortgagor to dispose of the *particular* property in suit.

3. Where a *portion* of the property covered by a chattel mortgage is claimed to have been released therefrom by the mortgagee, which he denies, evidence is admissible of the value of the *balance* of the property, as bearing upon the probabilities of such release.

Error to Genesee. (Newton, J.) Argued January 29, 1890. Decided February 20, 1890.

Replevin. Defendants bring error. Reversed. The facts are stated in the opinion.

*Durand & Carton,* for appellants, cited no authorities.

*S. B. Gaskill* and *Wisner & Johnson,* for plaintiff.

MORSE, J. This is an action of replevin to recover a team of horses and rig, consisting of buggy, harness, and

other things. The plaintiff had verdict and judgment against the defendants Conner and Dilley. Verdict of not guilty was rendered as to Wilson, by direction of the court.

Dilley and one George D. Wilson were in the livery business at Flint, under the firm name of R. G. Dilley & Co. March 19, 1888, they sold their entire stock to Riley for $2,125, Riley paying $25 down, and giving back a mortgage running to Dilley & Co. for $2,100, the balance of the purchase money, and also to secure the payment of $400 per year rent of the barn; such rent being payable to the defendant William S. Wilson, the owner of the barn. Dilley sold the stock to Riley, and George D. Wilson at that time seems to have had little, if any, interest in the same. In this mortgage was also included three horses, one buggy, and two sets of harness, which Riley brought from his home in Richfield to Flint at the time he purchased the livery stock of Dilley.

Riley continued in the business until about May 26, 1888, when he sold out to the defendant Conner. Wilson was active in bringing about this sale. Conner took the stock, with the exception of the property involved in this suit, and a bill of sale of the same was executed by Riley to him in the office of Lee & Aitken, attorneys at Flint. There were present, when it was drawn and signed, Lee, who drew it, and Riley, William S. Wilson, Conner, and Dilley. The bill of sale recited a consideration of $2,000, which was the actual consideration. No money was paid to Riley, but he was to have $25 in board of the team reserved. The lease of the barn was assigned in the bill of sale to Conner, and it was provided that Riley should warrant and defend the sale against all claims,—

"Except as against one chattel mortgage, of $2,100, given by said Riley to Dilley & Co., $100 of which mortgage is paid; the balance of said mortgage, $2,000, said

Conner assumes and agrees to pay according to its terms, and the terms of the note given therewith, as a part of the purchase price above mentioned."

After the delivery of the property sold to Conner, the team and rig in dispute in this suit were left in the barn, and the horses were being boarded by Conner. About May 31, 1888, Riley wanted to take his property away, but Conner would not let the team go without first seeing Dilley. Dilley refused to let them go, claiming the property on the chattel mortgage, on the ground that one of its conditions was broken, in that Riley had attempted to sell. the property and to remove it from the city of Flint without his assent. Riley then demanded the property, and brought this suit. The facts above given are practically undisputed.

The plaintiff claimed upon the trial that Dilley had released this property from the mortgage, and had taken Conner as the party to whom he would look for its payment, and the balance of the property in Conner's hands as his sole security for such payment. The defendant denied that he had ever released the property in suit from the operation of his mortgage, or had ever agreed to look alone to Conner and the property in his hands for its payment. The counsel for the defendants requested the court to instruct the jury to render a verdict for their clients, and they contend here that there was no evidence in the case competent to be submitted to the jury, tending in the slightest degree to show that the defendant Dilley ever released his mortgage upon the property in suit, or ever assented to any understanding that it should be released, or ever made any agreement looking in that direction.

The evidence certainly shows no express agreement that it should be released, but plaintiff's counsel claims that by Dilley's acts and words he in law released the prop-

erty, and he says in his brief that "the only question in this litigation is this: Did Dilley, by his acts and words, release his lien on this team and rig, when Riley sold to Conner?"[1]

The testimony shows that, after Riley and Conner had settled upon the terms of the sale, Dilley was sent for, and made acquainted with the bargain. He went to Lee's office with the others. Wilson, Conner, and Dilley swear that before going to the office, and on the way there, nothing was said to him in any way about releasing any of this property; nor was he asked to do so at the office, nor did he there agree to do so. The plaintiff, Riley, also testifies to the same effect. He says that, before they got to Lee's office,—

"I said nothing to him about releasing the mortgage, nor he to me."

In the office he testifies that Wilson instructed Lee what they wanted.

"I was present, and heard all that was said. After the paper [the bill of sale] was drawn I knew its contents, and signed it. Dilley sat there, and said nothing. He said nothing when Lee read the bill of sale, and asked if it was satisfactory, asked if it was all right. After reading it over he asked us all if it was all right. Wilson said, 'Yes; it was all right;' and Dilley nodded his head. I signed it. I don't think Dilley entered into the conversation, or had anything to say about it. At that point nothing was said about Dilley releasing a single thing from that mortgage, only what the bill of sale says. I don't recollect that a word was said by any of us about Dilley releasing the mortgage at that time. To my recollection, the question was not asked there by me, or some one there, if the mortgage was not paid, whether the mortgage held upon that property, and the reply made,

[1] Counsel for plaintiff cited, in support of this claim, *Phillips v. Clark*, 4 Metc. (Ky.) 348; *Titus v. Morse*, 63 Am. Dec. 665; *Dann v. Cudney*, 13 Mich. 239; *Holman v. Gillett*, 24 Id. 414; *Hayes v. Livingston*, 34 Id. 384; *Paneling Co. v. Parsell*, 38 Id. 480; *Johnson v. Stellwagen*, 67 Id. 16.

'Yes; the mortgage still holds upon all the property;' or words to that effect. * * * Nothing was said about releasing it, except what the paper contains."

Mr. Lee swears that his opinion was asked by one of the parties, while they were all there, about the effect of the bill of sale as to releasing the mortgage of Dilley upon this team and rig, and that he replied:

"If Conner goes on and pays this mortgage, which he has assumed, as agreed, in that case the team and rig will be exempt and freed from the chattel mortgage, and clear and released; otherwise the team would be holden."

That he told them that the mortgage still held upon the team, as well as upon the other property, and that he so stated clearly and distinctly. In this he was fully corroborated by Dilley, Wilson, and Conner.

It is argued by plaintiff's counsel that Dilley, knowing the bargain between Riley and Conner, and hearing the bill of sale read, which reserved the team and rig from the purchase, and provided that Conner should assume and pay the indebtedness secured by this mortgage, and giving his assent by silence to the transaction, must be considered as agreeing thereby, and consenting, to the release of the property from the mortgage, and is therefore estopped thereafter from asserting to the contrary. This is not so. The only assent that Dilley can be assumed in law, from the undisputed facts as to what occurred there, to have given, was that the sale might be made from Riley to Conner; and the only estoppel arising from his action would be that, under his silence there, he would not be permitted thereafter to claim a condition broken by such sale because his written assent was not obtained as provided by said mortgage.

The only testimony from which any release could possibly be claimed comes from witnesses, detailing statements made to them by Dilley after the sale from Riley to Con-

ner.   Riley  testifies  that  one  Sunday  afterwards  he  went
out  riding  with  Dilley,  and  was  saying  to  him  that  he
did  not  think  he  had  done  well  in  the  two  deals,  as  he
had  lost  money  or  property  in  them.    Dilley  said,  in
reply:

" I  think  you  have  got  out  of  it  well.    You  have  got
this  team  clear  from  everything,  and  they  are  worth  more
than  all  the  rest  of  the  stock  in  the  barn.".

He  testifies,  however,  that  Dilley  did  not  release  the
property  from  the  mortgage  at  that  time,  nor  does  he
claim  that  at  any  time  Dilley  ever  released  it,  or  agreed  to
do  so,  except  as  he  listened  to  the  reading  of  the  bill  of
sale,  and  made  no  objection  to  its  terms.    His  son,
William  Riley,  testifies  that  the  evening  of  the  day  the
sale  was  made  Dilley  told  him  that  his  father  had  done
well  enough.

" He  has  done  better  than  he  would  if  he  had  stayed.
He  has  got  that  gray  team  and  buggy,  harness,  robe,  and
whip,  and  all  out  of  debt."

And  that  Dilley  said  afterwards  to  his  mother,  at  their
house,—

" That  the  team  was  released,  and  the  buggy.    He  had
one  rig,  all  free  from  everything."

Mrs.  Riley  swears  that  she  heard  Dilley  tell  her  son  at
her  house  that  " Mr.  Riley  had  that  team  free  from  debt."
John  Eagan  testified  that  he  saw  Dilley  in  the  forenoon
before  the  sale,  and  Dilley  told  him—

" The  best  thing  Riley  could  do  was  to  sell  out,  for  he
could  get  his  choice  rig  in  the  barn  with  his  gray  horses,
and  get  out  of  debt,  and  get  out  of  town,  and  that  was
the  best  thing  he  could  do."

These  conversations  were  denied  by  Dilley,  and  it  was
pretty  conclusively  established  that  he  was  not  down  town,
and  did  not  see  Eagan  in  the  forenoon,  as  testified  to  by
that  witness.    In  the  face  of  the  testimony  of  Riley  that

the team was never released, or any agreement made by Dilley to do so, except by what took place at the time of the making of the bill of sale at Lee's office, and, as has already been said, as there was nothing done or said there by Dilley which would in any way release this property from the mortgage, or estop Dilley from asserting his lien upon it under the same, we are of the opinion that a jury would not be authorized to find such a release or estoppel from this testimony of Dilley's expressions afterwards, considering the weakness and unreliability of this kind of testimony, with its positive denial by Dilley. The question of the release of this mortgage, as the record stands, should not have been submitted to the jury, as it was not sufficient to sustain a finding that the property in question here was released.

The mortgage not being due, however, it was necessary for Dilley to show some condition broken in order to justify his retention of the rig and team. He claimed that he took possession of them because Riley said there was a man coming from Pontiac or Lapeer to buy them, and had repeatedly tried to sell or trade them.

Attempting to sell or dispose of the property, or to remove the same or any part thereof from the city of Flint, without the written assent of the mortgagee, would, by the terms of the mortgage, authorize the taking of possession by Dilley. The court, however, charged the jury, in effect, that, if Dilley assented to the transfer from Riley to Conner, that would be a waiver of the condition that Riley should not sell or dispose of the property, and Dilley would have no right to take possession of the property for a breach of the covenant that Riley should not sell or dispose of the same without the written assent of Dilley. This instruction was erroneous and misleading, for the reason that Dilley claimed no right to this team and rig because of the sale from Riley

to Conner, but placed his right upon the ground heretofore stated, of an attempt to sell to a man living outside of Flint, which claim of Dilley's was entirely ignored by the court in his charge, while, by the instruction above noted, the jury were put upon a false scent, and probably misled.

Several of the requests of defendants should have been given, but, as they referred to the release of this property from the mortgage, in view of what we have already said it is not necessary to mention them here. This also applies to the portions of the voluntary charge of the court excepted to by defendants.

Errors are also assigned in relation to the admission and rejection of testimony, which we will notice in view of a probable new trial:

1. While it may have been competent for Mr. Dilley to state that, on his way to the livery stable on the day of the sale, he stopped at the office of his attorneys for advice, what the attorneys stated to him was not admissible.

2. Evidence was admissible, under the issue, of the value of the stock covered by the chattel mortgage, with this team and rig out, as bearing upon the probabilities of a release of this property by Dilley.

3. The testimony of George D. Wilson was erroneously admitted. It was the statement of a conversation had with Dilley, and before the sale to Riley. It had no possible relevancy upon the issue in the case, and its only effect was to prejudice the jury against Dilley.

The judgment of the court below must be reversed, and a new trial granted, with costs of this Court to defendants.

CHAMPLIN, C. J., CAMPBELL and GRANT, JJ., concurred. LONG, J., did not sit.