Argument.

# Richmond.

## CARTER v. COMMONWEALTH.*

### MARCH 16, 1899.

1. CONTEMPTS.—*Words or Acts of Doubtful Import—Disclaimer of Improper Motive.*—If the intent with which a thing is said or done gives color and character to the act or words, a disclaimer of any purpose to be guilty of a contempt, or to destroy or impair the authority due to the court, is a good defence to a charge of contempt, but this is true only of language or acts of doubtful import, and which may reasonably bear two constructions.

2. CONTEMPTS—*Constitutional Courts—Jurisdiction to Punish Contempts Summarily—Jury Trial.*—There is an inherent power of self defence and self preservation in the courts of this State created by the Constitution. This power may be regulated by the Legislature, but cannot be destroyed or so far diminished as to be rendered ineffectual. It is a power necessarily resident in and to be exercised by the court itself, and the Legislature cannot deprive such courts of the power to summarily punish for contempts by providing for a jury trial in such case.

Error to a judgment of the Circuit Court of the city of Lynchburg rendered April 14, 1898.

*Affirmed.*

The opinion states the case.

*E. W. Saunders* and *James E. Edmunds*, for the plaintiff in error.

Mr. Saunders, of counsel for the plaintiff in error, argued, in substance, as follows:

The action of the inferior court, being in contravention of a constitutional statute, was illegal and void.

The statute is constitutional on three grounds: First, be-

---

*NOTE BY REPORTER: This case is reported out of chronological order by reason of its importance.

cause our Circuit Courts are not of constitutional creation. Second, because if created by the Constitution, they are not endowed with any jurisdiction by that instrument. Third, because the provisions of the act are a reasonable regulation of the contempt powers of the court, and if reasonable, the statute is constitutional, whether it relates to courts created by the Constitution, or the Legislature, or deriving their jurisdiction from the one, or the other, or both.

The Constitution of Virginia (Article VI., sec. 11,) declares that there shall be a Supreme Court of Appeals, Circuit Courts, and County Courts, and that the *jurisdiction* of these tribunals, save so far as the same is conferred by the Constitution, shall be regulated by *law*.

Our Circuit Courts have no jurisdiction except what is conferred by direct legislative enactment, or is derived through sec. 2 of the Code, adopting the common law of England, so far as it is not repugnant to our Constitution and Bill of Rights.

What the Legislature gives, it can take away, and at any session can strip the Circuit Courts of every vestige of jurisdiction, leaving them an empty shell, a mere name. *Stat nominis umbra*.

The Federal Constitution declares that the judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as Congress may from time to time establish.

This language has been construed in *Ex Parte Robinson*, 19 Wallace.

The facts of that case are of no particular interest, but the conclusions of the court are of the utmost importance. It is held, that the act of Congress of 1831, limiting the powers of the Federal courts, applies to the Circuit and District Courts of the United States—that these courts were created by act of Congress—that their powers and duties depend upon the act calling them into existence, or subsequent acts affecting their *jurisdiction*—that the act of 1831 is, therefore to them, the *law*

*specifying* the *cases* in which *summary punishment* may be inflicted.

The conclusions reached in that case have never been modified, but have been adopted and approved in several later decisions.

The argument that the powers of the court in matters of contempt should not be seriously abridged by the Legislature, proceeds upon the theory that our State governments are divided into three departments, and one ought not to encroach upon the functions of another.

But the Federal Constitution divides the powers of government into three departments, and *Kilbourne* v. *Thompson*, 103 U. S. p. 163, declares that neither department can be allowed to encroach upon the powers exclusively committed to the others.

If the control by Congress of all the contempt powers of all the inferior courts of the United States, and the exercise by Congress of that power, is an *encroachment* upon the proper functions of the courts, then *Ex Parte Robinson*, and the subsequent cases approving the same, cannot be reconciled with *Kilbourne* v. *Thompson*. The contention that Congress has the full, free, and unfettered control of the contempt powers of all the inferior Federal courts, could not be more fully, broadly, and authoritatively stated than is done in *Ex Parte Robinson*.

The claim that courts mentioned by name in the Constitution are to be considered as holding rights in matters of contempt superior to those courts which are directed to be created by the Constitution, does not seem to rest upon any solid basis of reason. When a constitution provides, as in the case of the Federal Constitution, that all the judicial authority of the country shall reside in one Supreme Court, and such other courts as the legislative department shall create, then those courts are potentially in existence. When, in the discharge of its constitutional duty, they are established by the Legislature, they would seem to be *constitutional courts*. Certainly the argument is as strong, if the policy is sound, that the con-

tempt powers of the courts should not be subjected to legislative interference, that these courts, charged with duties fully as important as the duties committed to the courts nominated in the Constitution, should be held to be superior to legislative interference.

Such, we have seen, is not the case, in respect to that system of Federal courts subordinate to the Supreme Court, but wielding the vast powers lodged in them by the National Government. Still, it is not perceived that any evil has resulted from this relation of the inferior Federal courts to Congress. In the same sense in which the duties of the Federal courts depend upon the acts of Congress, the duties of our Circuit Courts depend upon the legislative acts, endowing them with jurisdiction. Without these acts, there would be nothing for them to operate upon—no suitors to be impleaded—no matters to be drawn in controversy.

The Virginia Constitution of 1829, in Article V., says that the judicial power shall be vested in a Supreme Court of Appeals, and in such superior courts as the Legislature may from time to time ordain and establish.

The language in the Constitution of 1850 is practically that of the present Constitution, which has been cited. Now, it is scarcely credible that in using the later language, the Constitution makers thought that the courts thereby provided for were better endowed, in respect to authority in matters of contempt, than the courts created under the Constitution of 1829–30. If they intended to create courts which should possess these larger powers, they signally failed, for the denomination of the courts in the Constitution did not vest them with jurisdiction. This jurisdiction they left to the discretion of the Legislature. But why is it necessary to hold that the courts mentioned by name in the Constitution should possess contempt powers superior to legislative control? We have seen that such is not the case in Federal jurisdiction, in respect to the bulk of its courts, and yet no evil has resulted

from this state of things, although these courts have strenuously maintained the distinction of the three departments of government. It is said that from our conception of courts derived from the English jurisprudence, we must hold that when courts are spoken of, in the Constitution, that instrument means courts endowed with common law powers as to contempts, and as a further conclusion we must hold that these inherent common law powers are superior to legislative curtailment, to any decisive degree. But is this a just and necessary conclusion? It is true that, at common law, the courts possessed large powers, far larger than even the so-called constitutional courts are admitted to possess to-day; but if we take our conception of the powers of the courts in this respect from the common law, we must take from the same common law another principle, which is, that at common law these courts held their contempt power at the mercy of legislative authority. There was, and is, no common law contempt power which Parliament in England cannot take from the courts, against their will, for there is no such thing as an unconstitutional act of Parliament. Since this whole argument for the possession of powers of contempt superior to legislative control is one of implication, why is it not a juster implication that when our Constitution mentions courts, it means courts as understood at *common law*, that is, courts with inherent powers of contempt, but holding them at the legislative will? This is the only common law court we know. There was no such court at common law as one with powers beyond the legislative reach.

But in our Constitution it is plain that when it speaks of courts by name, it intends to establish the classes of courts in this State by name, and not to fix their powers of contempt. The argument by implication proves too much. If the mere constitutional denomination of the courts is intended to lodge in them common law contempt powers, and to fence them against legislative authority, whence comes the right, which has been freely exercised in every State, to largely

reduce their powers by· legislative enactment? It is evident that the courts have shrunk from pushing the principle to its extremest conclusion, though it is often asserted in its broadest form. They have rather established a modified principle that the courts possess common law powers, subject to legislative curtailment, provided the curtailment is not too extensive. They have sought to preserve for themselves the right to determine the measure of curtailment which the Legislature may apply. But the latter is not a common law principle, since such a thing as a modified power of legislative curtailment was not known at common law. It was an absolute one.

But, grant that because our Circuit Courts are named in the Constitution they are entitled to a measure of protection against legislative regulation, what is the extent of that protection? It must be logically true that the contempt powers which they hold superior to legislative control must be those powers which are necessary to preserve the dignity and self respect of the courts against offenders in their presence, while all powers of contempt which are needful only to enable them to carry out and enforce jurisdiction which they do not derive from the Constitution, but from the Legislature, must be subordinate to the controlling power of the latter body. The court is not in a true sense the creation of the Constitution unless it is both *named* in the Constitution, and constitutionally endowed with jurisdiction. This is the principle clearly enunciated in *State* v. *Frew*, 49 Am. Reports p. 275, but more fully reported in the West Va. Reports. In that case it is declared that when jurisdiction is conferred by statute, it may be taken away by statute, at the pleasure of the Legislature. As a consequence, the same powers can prescribe the measure or mode of punishments for contempts against the exercise of this jurisdiction. This is logical. The editor of the Lawyers' Reports Annotated, in a recent note reviewing all the cases, declares that the power which has the constitutional right to determine jurisdiction, may restrict in respect to the punishment for con-

tempt. This is the true principle as enunciated in *Ex Parte Robinson*. Should the Legislature withdraw all jurisdiction from the Circuit Courts, great harm and public confusion would follow, but it would be a constitutional exercise of authority. The policy might be bad, but the power to put the policy in operation would be undoubted. The Legislature might abolish the writs of *mandamus* and injunction. This would cripple the usefulnes of the courts, and hinder them in the exercise of jurisdiction conferred far more than the present statute of contempts, conceding that it is vicious, can possibly do; but it would be within the constitutional powers of the Legislature. The present statute does not interfere with contempts in the presence of the court, or their punishment, but only with contempt powers which have to be invoked to carry out and effectuate the civil jurisdiction of the courts. We may imagine the courts saying to the Legislature : " You have taken from us a power which, like the writs of execution, *mandamus*, and injunction, is needed to make effectual, for public purposes, the jurisdiction which you have given us," but the answer of the Legislature would be that this was not the concern of the courts. All matter relating to jurisdiction, and whether it shall be effectively or ineffectively exercised, belong to the Legislature, and is a matter of legislative policy.

It is not conceded that the policy of the present statute is bad, but conceding that it is, the courts have declared in *Smoot* v. *B. & L. Association*, 29 S. E. p. 748, and in many other cases, that, with reference to the policy or impolicy of the acts of the General Assembly, they have no concern. Much confusion has arisen in the consideration of this subject by the use of the words " inherent power," when speaking of the contempt power resident in the courts. This language does not mean, and has never meant, that these powers are held superior to legislative control. It did not mean that at common law. In the Federal jurisdiction it is repeatedly declared that the inferior Federal courts have all the inherent powers of

other courts. In *Ex Parte Robinson* it is declared that the power to punish for contempt is inherent in all courts, that it is essential to the promotion of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and, consequently, to the due administration of justice; that the moment the courts of the United States came into existence, and were invested with jurisdiction over any subject, they became possessed of this power. Still, in the next paragraph, the court declared that all these powers could be taken from the Federal courts by act of Congress. No courts have stated the doctrine of inherent power, touching contempt, more strongly than the English courts; but this was done with full knowledge on their part that these powers were held at the will of Parliament. *Ex Parte Robinson* declares that the Federal courts became possessed of these powers, not at the moment of existence, but as soon as that existence was coupled with the investiture of jurisdiction. In the case of our Circuit Courts, as this power came into existence in connection with jurisdiction conferred by statute, it would seem that this power of contempt, necessary, according to *Ex Parte Robinson*, for the enforcement of the judgments, writs, and orders of the courts, and coming into existence in connection with jurisdiction conferred exclusively by the Legislature, would be controlled by the creator, the fountain and source of this jurisdiction, the General Assembly of Virginia.

In the case of *State* v. *Frew, supra,* the West Virginia Supreme Court cautiously bases the claim of the Circuit Courts of that State to be exempt from legislative interference, in the exercise of their powers of contempt, upon the ground that the Constitution of that State expressly creates the courts, and· in great detail endows them with jurisdiction. See Const. W. Va.

But, admitting that, although our Circuit Courts are merely named in the Constitution, and derive no jurisdiction from that instrument, they are still constitutional courts in the sense that

they are not completely subject to the control of the General Assembly in respect to their powers of contempt, and the statute of '97-8 is constitutional, since the regulations it makes are reasonable in their character. It has repeatedly been held that the Legislature can regulate this power. See *Wyatt* v. *People*, 17 Colo. 252; *Stuart* v. *People*, 4 Ill. 395; *State* v. *Galloway*, 5 Colo. 326; 89 Am. Dec. p. 407.

But this so-called power to regulate is really the power to curtail, and take away within limits. At common law, the power of the court to fine and punish for contempt was unlimited. In Virginia, according to the provisions of the Code, which have been unchanged by the present statute, a court cannot fine more than $50, or imprison more than ten days. For a larger punishment a jury must be invoked. This is not a regulation, but an absolute deprivation and curtailment of power. So as to many other alleged regulations. They are simply curtailments. Now, the present law is but the extension of this use of juries. If it is permissible to take from the courts the largest portion of the common law power to fine and imprison for direct contempts, and transfer it to a jury, and that without injury to the public interests, it is not perceived why the power of contempt used for the *enforcement of jurisdiction* only may not be transferred to a jury without public injury.

It can be done, unless the jury is a feeble and inefficient instrument of upholding the authority of the law, and promoting the welfare of society.

It can be done, if the jury, as an instrument of justice, deserves the encomiums passed upon it by many jurists, courts, and law writers, and by this court in *Brown* v. *Epps*, 91 Va. p. 738, and other cases. The principle appears to be that under the guise of regulation, the Legislature can take from the courts the inherent powers of contempt, provided only that the interests of public justice do not suffer.

The present statute, then, is simply the exercise of this principle, and the extent to which it goes, is one of degree. Un-

less it can be shown that the public interests will suffer by the use of the jury for the trial of indirect contempts, that they will not be impressed with the necessity of upholding the authority of the State, then the recent statute is a reasonable regulation, as regulation has been understood, of the powers of the courts.

In this State, for instance, for over fifty years, with the full acquiescence of the courts, and written into each succeeding Code, is a statute of contempts which denies the courts the right to proceed at all against contumelious critics of their proceedings. *Wells' Case*, 21 G. p. 504 *et seq.*, declares that, where it is not otherwise provided by statute, the sole adjudication of contempts, and the punishment thereof, belong to each respective court.

This is a judicial recognition that the Legislature can regulate the matter of contempts, though the same case speaks of the inherent powers of the courts in this respect. The case at bar is not triable by the judge, under the present statute, nor was it so triable under the provisions of the Code which have been continued for over fifty years. Hence, if the statute is unconstitutional *quoad* this case, in not giving the court the right of summary punishment, the Code, which equally denies it, is equally unconstitutional. *Dishen and Another* v. *The Commonwealth*, 4 Leigh 685, is another judicial recognition of the right of legislative regulation touching contempts.

The principle that, by implication, the courts possess a power to punish for contempt which is beyond legislative regulation, is a contention not founded upon any sound principle, and not easily reconciled with the judicial admissions in the adjudged cases cited, that large powers of this character can be taken from the courts, provided only the public interests do not suffer. The courts are mere agencies of society. The powers they claim are not for themselves, but for society. They have admitted the right of the people through the Legislature to deprive them of a large measure of the so-called common law

powers. They have established the criterion that this derpiva-tion can proceed to any given extent, so that the interests of society do not suffer. A statute is presumably constitutional, unless it is plainly and palpably unconstitutional. *Smoot* v. *B. & L. Association, supra.*

Unless, therefore, it can be plainly and palpably shown that by the use of juries for the trial of indirect contempts, the welfare of society will seriously suffer, the statute in question is constitutional.

The suggestion that in any given case the use of the jury may consume greater time than would trial by the court, is no argument against the statute. Such an argument would be equally potent against the use of the jury in any case. The reasons of policy for change in the law of contempt embodied in the present statute, are not discussed, but it may be said that the experience of other countries has shown that there is no danger to the Commonwealth in holding that the Legislature has supreme powers of regulation over the contempt authority of our Circuit Courts. The experience of England and Canada is cited, and coming nearer home we find that in the State of Georgia the Constitution provides that the Legislature shall control and regulate in all respects the contempt powers of the courts of that Commonwealth. This has been a part of Georgia's Constitution for many years, but it has not been per-ceived that her courts, on that account, have failed in the asser-tion of their authority, sunk in public respect, or lost their usefulness as public functionaries.

The judgment of the lower court in this case should be reversed.

*Attorney-General A. J. Montague,* for the Commonwealth.

KEITH, P., delivered the opinion of the court.

At its November term, 1897, the Circuit Court of the city of Lynchburg issued a rule against Carter, plaintiff in error,

to appear before it on the first day of the next term to show
cause why he should not be fined and attached for contempt,
by attempting to obtain a continuance of the action of *Grubbs
against Carter*, by means of false telegrams.   In answer to this
rule he appeared and stated that he is a resident of the county
of Nottoway, and that, having received a telegram from his
attorney, J. Emory Hughes, that his case was pending and he
must come to Lynchburg on the next train, he wired in re-
sponse, " Sick with typhoid fever, and can't come ; " that this
statement as to his health was false and made without due
consideration; that he had no idea of interfering with or
impeding the course of justice ; that he did not make the
statement for the purpose of obtaining a continuance, and
nothing was further from his mind; that no disrespect to the
court was intended; and he prays that his fault may be over-
looked.

When the matter came up for trial Carter asked to be tried
by a jury, which motion the court overruled, and, deeming his
answer insufficient, entered a judgment against him for a fine
of $25 and costs, and that he be imprisoned for the term of
two days in the jail of the city of Lynchburg, and afterwards
until he pay his fine and costs, provided that this latter period
shall not exceed two months.   To this judgment Carter
obtained a writ of error from one of the judges of this court,
and the errors assigned by him are, first, that upon the facts
as shown in the record he was not guilty of a contempt;
secondly, that the court erred in refusing to have a jury
empanelled for his trial.

We are of opinion that upon the facts shown Carter was
guilty of a contempt.   The effort to obtain a continuance of
his cause by means of a statement as to his health which he
knew to be false tended directly to impede and obstruct the
administration of justice.   It is true that with respect to con-
duct or language where the intent with which a thing is said
or done gives color and character to the act or words, a dis-

claimer of any purpose to be guilty of a contempt or to destroy or impair the authority due to the court, is a good defence (Rapalje on Contempt, sec. 115); but this is true only of language or acts of doubtful import, and which may reasonably bear two constructions. In the case before us there could have been but one motive, and that to influence the action of the court with respect to a case before it by means of a statement known and admitted to be false. We pass, therefore, to the consideration of the next error assigned. This presents a question of the utmost gravity, which has been argued with the ability which its importance demands, and has received from us our best consideration.

By an act of Assembly passed in 1830–31 (see Session Acts, p. 48,) the Legislature undertook to enumerate and to classify contempts of court, and to prescribe the manner in which they should be punished. This act appears in the Code of 1849 as sections 24 and 25, chapter 194, as follows:

"Sec. 24. The courts and the judges, and justices thereof, may issue attachments for contempts, and punish them summarily, only in the cases following:

*First.* Misbehaviour in the presence of the court, or so near thereto as to obstruct or interrupt the administration of justice.

*Secondly.* Violence or threats of violence to a judge, justice or officer of the court, or to a juror, witness or party going to, attending, or returning from, the court, for or in respect of any act or proceeding had, or to be had, in such court.

*Thirdly.* Misbehaviour of an officer of the court, in his official character.

*Fourthly.* Disobedience or resistance of an officer of the court, juror, witness or other person, to any lawful process, judgment, decree or order of the said court."

"Sec. 25. No court shall, without a jury, for any such contempt as is mentioned, impose a fine exceeding fifty dollars, or imprison more than ten days. But in any such case the court may empanel a jury (without an indictment, information or any formal pleading) to ascertain the fine or imprisonment proper to be inflicted, and may give judgment according to the verdict."

This act was continued in force without amendment until the session of 1897–8, p. 548, when it was amended so as to read as follows:

Opinion.

"1. Be it enacted by the General Assembly of Virginia, That section three thousand seven hundred and sixty-eight of the Code of Virginia be amended and re-enacted so as to read as follows:

Section 3768. The courts and judges may issue attachments for contempt, and punish them summarily, only in the following cases, which are hereby declared to be direct contempts, all other contempts being indirect contempts:

*First.* Misbehaviour in the presence of the court, or so near thereto as to obstruct the administration of justice.

*Second.* Violence or threats of violence to a judge or officer of the court or to a juror, witness or party going to, attending or returning from the court, for or in respect of any act or proceeding had or to be had in such court.

*Third.* Misbehaviour of an officer of the court in his official character.

*Fourth.* Disobedience or resistance of an officer of the court, juror or witness to any lawful process, judgment, decree or order of the said court.

When the court adjudges a party guilty of a direct contempt it shall make an entry of record, in which shall be specified the conduct constituting such contempt, and shall certify the matter of extenuation or defence set up by the accused, and the evidence submitted by him and the sentence of the court."

*Subsection.*

"Proceedings in Cases of Indirect Contempt.—Upon the return of an officer on process, or upon an affidavit duly filed, showing any person guilty of indirect contempt, a writ of attachment or other lawful process may issue, and such person may be arrested and brought before the court; and thereupon a written accusation, setting forth succinctly and clearly the facts alleged to constitute such contempt, shall be filed, and the accused required to answer the same, by an order which shall fix the time therefor and also the time and place for hearing the matter. A copy of this order shall be served upon the accused, and upon a proper showing the court may extend the time so as to give the accused a reasonable opportunity to purge himself of such contempt.

After the answer of the accused, or if he fail or refuse to answer, the court may proceed at the time so fixed to hear and determine such accusation upon such testimony as shall be produced. If the accused answer, the trial shall proceed according to the rules governing the trial of crimnal cases, and the accused shall be entitled to compulsory process for his witnesses and to be confronted with the witnesses against him.

Such trial shall be by the court, or, upon the application of the accused, a trial by jury shall be had, as in any case of a misdemeanor.

If the jury find the accused guilty of contempt, they shall fix the amount of his punishment by their verdict.

The testimony taken on the trial of any case of contempt shall be pre-
served on motion of the accused, and any judgment of conviction therefor
may be reviewed on writ of error from the Circuit Court having jurisdic-
tion, if the judgment is by a County Court, or on writ of error from the
Supreme Court of Appeals, if the judgment is by a Circuit or Corporation
Court.   In the Appellate Court the judgment of the trial court shall be
affirmed, reversed, or modified as justice may require.   If the writ of
error to the judgment of a County Court is refused by the Circuit Court
having jurisdiction, application may then be made to the Court of Appeals.

2. All acts and parts of acts, so far as they conflict with this act, are, to
that extent, hereby repealed."

Being of opinion that the defendant was guilty of contempt,
we shall not attempt any classification of it as a direct or indi-
rect contempt.   If it were a direct contempt, then its punish-
ment was without doubt to be ascertained and fixed by the
court without the intervention of a jury by the terms of the
law which the plaintiff in error himself invokes.   If it were a
contempt, not within that classification, then it is incumbent
upon us to consider whether it was within the power of the
Legislature to deprive the court of jurisdiction to punish it
without the intervention of a jury.

Counsel for plaintiff in error insist that the question has
already been decided by this court in the case of *Commonwealth*
v. *Deskins*, 4 Leigh 685, and again in *Wells* v. *Commonwealth*,
21 Gratt. 500.

The latter case may be disposed of by the statement that this
court reversed the judgment of the Circuit Court upon the
facts, and held that the acts proved against Wells did not con-
stitute a contempt of court.

With respect to the case of *Commonwealth* v. *Deskins*, it
appears that it arose, and was decided, under the Constitution
of 1829–30.   In the fifth article of that instrument, it is pro-
vided that "the judicial power shall be vested in a Supreme
Court of Appeals, in such superior courts as the Legislature
may from time to time ordain and establish, and the judges
thereof, in the County Courts, and in justices of the peace.
The Legislature may also vest such jurisdiction as shall be

deemed necessary in Corporation Courts, and in the magistrates who may belong to the corporate body. The jurisdiction of these tribunals, and of the judges thereof, shall be regulated by law."

The Constitution did not create the courts, nor clothe them with jurisdiction, but the courts themselves were established by the Legislature, and their jurisdiction was regulated by law. In this respect the Constitution of 1829-30 was only less general in its terms than the first organic instrument adopted in 1776.

The Constitution of 1850, Article VI., sec. 1, with respect to the judiciary department, provides : " There shall be a Supreme Court of Appeals, District Courts, and Circuit Courts. The jurisdiction of these tribunals, and of the judges thereof, except so far as the same is conferred by this Constitution, shall be regulated by law."

Article VI., sec. 1, of the Constitution now in force, provides : " There shall be a Supreme Court of Appeals, Circuit Courts, and County Courts. The jurisdiction of these tribunals, and of the judges thereof, except so far as the same is conferred by this Constitution, shall be regulated by law." In a subsequent portion of the instrument, Corporation Courts are also provided for the cities of the State. These courts do not derive their existence from the Legislature. They are called into being by the Constitution itself, the same authority which creates the Legislature, and the whole framework of State government.

What was the nature and character of the tribunals thus instituted ? Our conception of courts, and of their powers and functions, comes to us through that great system of English jurisprudence known as the common law, which we have adopted and incorporated into the body of our laws.

That the English courts have exercised the power in question from the remotest period does not admit of doubt. Said Chief Justice Wilmot: " The power which the courts in Westminster Hall have of vidicating their own authority is coeval with

their first foundation and institution; it is a necessary incident to every court of justice, whether of record or not, to fine and imprison for a contempt acted in the face of the court; and the issuing of attachments by the Supreme Court of Justice in Westminster Hall for contempts out of court, stands on the same immemorial usage which supports the whole fabric of the common law; it is as much the *lex terrae*, and within the exception of Magna Charta, as the issuing of any other legal process whatsoever. I have examined very carefully to see if I could find out any vestiges of its introduction, but can find none. It is as ancient as any other part of the common law; there is no priority or posteriority to be found about it; it cannot, therefore, be said to invade the common law; it acts in alliance and friendly conjunction with every other provision which the wisdom of our ancestors has established for the general good of society. Truth compels me to say that the mode of proceeding by attachment stands upon the very same foundation as trial by jury; it is a constitutional remedy in particular cases, and the judges in those cases are as much bound to give an activity to this part of the law as to any other." 3 Campbell's Lives of Chief Justices, 153.

In *United States* v. *Hudson et als.*, 7 Cranch 32, it was held that " certain implied powers must necessarily result to our courts of justice from the nature of their institution. But jurisdiction of crimes against the State is not among those powers. To fine for contempt, imprison for contumacy, enforce the observance of order, etc., are powers which cannot be dispensed with in a court, because they are necessary to the exercise of all others; and so far our courts, no doubt, possess powers not immediately derived from statute."

In *Wells* v. *Commonwealth*, 21 Gratt. 503, it was said: " The power to fine and imprison for contempt is incident to every court of record. The courts, *ex necessitate*, have the power of protecting the administration of justice, with a promptness calculated to meet the exigency of the particular case."

It is unnecessary, however, to multiply authority upon this point, for we understand it to have been conceded by counsel for plaintiff in error that the power to punish contempts is inherent in all courts, but the contention is that it may be regulated by legislative action, and we are prepared to concede that it is proper for the Legislature to regulate the exercise of the power so long as it confines itself within limits consistent with the preservation of the authority of courts to enforce such respect and obedience as is necessary to their vigor and efficiency.

Now, the contention of the plaintiff in error is that the act here punished was not a contempt under the statute of 1830–31, and that in order to hold it punishable summarily it is necessary to hold that the statute referred to is unconstitutional. There has been no adjudication upon that statute to our knowledge since the adoption of the Constitution of 1851, for in the case of *Wells* v. *Commonwealth, supra,* Wells was, as we have seen, acquitted of the offence. So far, therefore, as the statute is to be considered as declaratory of the powers existent in the courts established by the Constitution, it is free from objection; so far as it is a reasonable regulation of the power vested in the courts, we have no disposition to question it, but if it is to be construed as a negation of the power of the court to punish a contempt, whether by excluding it from its enumeration and classification of acts which may be summarily dealt with by the court, or by taking from the courts the power to punish at all, even those acts enumerated as contempts, we are constrained to hold that the Legislature has transcended the powers prescribed to it by the Constitution.

It was contended by counsel for plaintiff in error that, inasmuch as the act of 1897–8 merely transferred the punishment of contempts from the court to a jury, and even made acts punishable as contempts not embraced within the act of 1830–31, it was not obnoxious to the objection that it interfered with or diminished the power of the court to protect itself.

To this view we cannot assent. It is not a question of the degree or extent of the punishment inflicted. It may be that juries would punish a given offence with more severity than the court, but yet the jury is a tribunal separate and distinct from the court. The power to punish for contempts is inherent in the courts, and is conferred upon them by the Constitution by the very act of their creation. It is a trust confided and a duty imposed upon us by the sovereign people which we cannot surrender or suffer to be impaired without being recreant to our duty.

Upon the point made by counsel for plaintiff in error that the offence under consideration, if not embraced within the category of direct contempts by the act of 1897-8, neither was it by that of 1830-31, we cannot do better than to quote the language of the Supreme Court of Arkansas in *State* v. *Morrill*, 16 Ark., at page 390:

"The Legislature may regulate the exercise of, but cannot abridge, the express or necessarily implied powers granted to this court by the Constitution. If it could, it might encroach upon both the judicial and executive departments, and draw to itself all the powers of government; and thereby destroy that admirable system of checks and balances to be found in the organic framework of both the Federal and State institutions, and a favorite theory in the government of the American people.

"As far as the act in question goes, in sanctioning the power of the courts to punish, as contempts, the '*acts*' therein enumerated, it is merely declaratory of what the law was before its passage. The *prohibitory* feature of the act can be regarded as nothing more than the expression of a judicial opinion by the Legislature, that the courts may exercise and enforce all their constitutional powers, and answer all the useful purposes of their creation, without the necessity of punishing as a contempt any matter not enumerated in the act. As such, it is entitled to great respect, but to say that it is absolutely binding

upon the courts would be to concede that the courts have no constitutional and inherent power to punish any class of contempts, but that the whole subject is under the control of the legislative department, because if the General Assembly may deprive the courts of power to punish one class of contempts, it may go the whole length, and divest them of power to punish any contempt."

Reliance was placed by counsel for plaintiff in error upon a class of cases of which *Ex Parte Robinson*, 19 Wall. 505, may be considered typical. In that case Robinson had, in the most summary manner, without the opportunity of defence, been stricken from the roll of attorneys by the District Court for the Western District of Arkansas. He applied to the Supreme Court for a *mandamus*, which is the appropriate remedy to restore an attorney who has been disbarred, and that court held, Mr. Justice Field delivering the opinion, that "the power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and, consequently, to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power. But the power has been limited and defined by the act of Congress of March 2, 1831," and the court declared that there could be no question as to its application to the Circuit and District Courts. "These courts were created by act of Congress. Their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction. The act of 1831 is, therefore, to them the law specifying the cases in which summary punishment for contempts may be inflicted."

Turning to the Constitution of the United States, we find that it declares that the "judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish." This language is the equivalent of that found in our

Constitutions prior to that of 1851, hereinbefore quoted. The inferior Federal courts and their jurisdiction are the creatures of Congress, and not of the Constitution.

It may be remarked also, with respect to the case of *Ex Parte Robinson*, that although the United States statute of 1831 carefully enumerates the subjects for which courts may punish summarily for contempt, that enumeration is so comprehensive as to afford complete protection to the courts in the perform-ance of their duties, and contains no limitation whatever upon the power to punish in the enumerated cases, and that while punishment which courts may inflict is limited to fine and im-prisonment, their discretion is without limit as to the amount of the fine or the duration of the imprisonment. The courts of the United States will never be embarrassed by the decision in *Ex Parte Robinson*, for while the power to disbar an attorney is denied in that case as a proper punishment for contempt, the jurisdiction of the courts to disbar after citation to appear and notice of the ground of complaint against and an opportunity for explanation and defence is fully recognized.

It were an unprofitable task to attempt to review, within the limits of an opinion, all the adjudged cases to which our atten-tion has been called, and which, with very many others, have been considered by us. For the benefit of those who may feel themselves moved to a further investigation of this subject, we cite, without comment, the following cases : *State* v. *Frew*, 24 W. Va. 416; *Hale* v. *State*, 36 L. R. A. 256; *In re Shortridge*, 99 Cal. 526; *Storey* v. *The People*, 79 Ill. 45; *Holman* v. *State*, 105 Ind. 513; *State* v. *Knight*, 3 S. Dakota, 509 ; *State* v. *Gallo-way*, 5 Cold. 326; *Little* v. *State*, 90 Ind. 338; *Baldwin* v. *State*, 126 Ind. 24; *Arnold* v. *Commonwealth*, 80 Ky. 300; *Ex parte Crenshaw*, 80 Mo. 447; *Hughes* v. *The People*, 5 Colo. 445; *Wyatt* v. *The People*, 17 Colo. 252; *Langdon* v. *Wayne*, 76 Mich. 367; and *Ex parte Schenck*, 65 N. C. 353.

In public apprehension the Legislature is deemed in a peculiar sense the agent and representative of the people. It is true it constitutes the most numerous branch of the govern-

ment, and the brief terms for which its members are elected, and the fact that they are directly voted for by the people, give color to and encourage this opinion, but a moment's reflection should serve to dispel it. In our system of government all power and authority are derived from the people. They have seen fit by organic law to distribute the powers of government among three great co-ordinate departments—the executive, the legislative, and the judicial. The Constitution of the State, which is the law to all, declares, in the seventh section of the first article, that "the legislative, executive, and judicial powers should be separate and distinct." This is a quotation from the Bill of Rights, an instrument which should never be mentioned save with the reverence due to the great charters of our liberties. Of such importance is this principle deemed that it is repeated, and constitutes a distinct article, which declares that "the legislative, executive, and judiciary departments shall be separate and distinct, so that neither exercise the powers properly belonging to either of the others; nor shall any person exercise the power of more than one of them at the same time, except as hereinafter provided." Const. of Va., Art. II. Whoever, therefore, belongs to either one of these great departments is an agent and servant of a common master; and each and all represent a part of the sovereignty of the State so long as they move within the appropriate spheres prescribed to them by the organic law. A court, and the judge thereof, is as much an agent and servant of the people as any other officer of government, and he is bound by the duty and obligation which he owes to the Commonwealth to cherish, defend, and transmit unimpaired to his successors, the office with which the Commonwealth has seen fit to honor him. A judge, therefore, in vindicating the dignity and authority of the court over which he presides is discharging a solemn duty owed in his official character, and is not engaged in a personal and private controversy.

Speaking upon this subject, the Supreme Court of West Virginia, in *State* v. *Frew*, 24 W. Va. at page 477, uses the following language:

"Having thus shown that this court has the power to punish for contempts, it must not be overlooked that this power can be justified by necessity alone, and should rarely be exercised, and never, except when the necessity is plain and unmistakable. It is not given for the private advantage of the judges who sit in the court, but to preserve to them that respect and regard of which courts cannot be deprived and maintain their usefulness. It is given that the law may be administered fairly and impartially, uninterrupted by any influence which might affect the rights of the parties or bias the minds of the judges—that the court may command that respect and sanctity so essential to make the law itself respected—and that the streams of justice may be kept pure and uncorrupted." * * * * *

"The public have a profound interest in the good name and fame of their courts of justice, and especially of the courts of last resort. Everything that affects the well-being of organized society, the rights of property, and the life and liberty of the citizen is submitted to their final decision. The confidence of the public in the judiciary should not be wantonly impaired." * * * * * * * * * * *

"We know full well that respect to courts or judges cannot be compelled; 'respect is the voluntary tribute of the people to worth, virtue, and intelligence, and while these are found on the judgment seat, so long, and no longer, will courts retain the public confidence.' But the people have placed the judge in a position in which he unavoidably comes in conflict with the jealousies and resentments of those upon whose interest he has to act; his character, virtue, and intelligence, however pure and unselfish, are not always a protection against the prejudices and passions of such as conceive themselves injured by his legitimate and proper official acts, and when assailed by such, if he may not punish them as a court, 'he will be reduced to

the alternative of either submitting tamely to contumely and insult, or to resenting it by force or resorting to the doubtful remedy of an action at law.' "

As was said by Judge Dade in *Dandridge's Case*, 2 Va. Cases 408:

" In such a state of things it would rest in the discretion of every party in court to force the judge either to shrink from his duty, or to incur the degradation of his authority, which must unavoidably result from the adoption of either of the above alternatives. To suppose that the personal character of the judge would be a sufficient guarantee against this, is to imagine a state of society which would render the office of the judge wholly unnecessary."

The enumeration of subjects punishable as direct contempts in the act under consideration seems to embrace almost every conceivable form of that offence which can occur in the presence of, or in proximity to, the court, that is to say, under circumstances likely to arouse the passion or prejudice of the judge, and disturb that equanimity essential to calm and wise judicial action. The court may punish summarily not only all such offences, but for disobedience or resistance to any lawful process, judgment, decree or order, its officers, jurors and witnesses may also thus be punished; and only the parties to the suit are entitled to a trial by jury. Thus we see that offences of a nature personal to the court are to be punished by the court, while those which interest suitors are punishable only by a jury. So that suitors having obtained a judgment or decree, after long and expensive litigation, find the court powerless to secure to them its fruition and enjoyment and, unless their antagonist chance to be a law-abiding citizen, discover that their success has only begotten another controversy. Ours is a law-abiding community, and good citizens will, without compulsion, respect the lawful orders of their courts; but in every society there are those who obey the laws only because there is behind them a force they dare not resist. Is it

wise or beneficent legislation which accepts the obedience of the good citizen, but is powerless to enforce the law against the recalcitrant? Under this law the authority of the courts would be reduced to a mere "power of contention."

We are fully aware of the delicate duty involved in holding a statute to be unconstitutional, and we fully recognize that it should never be done except in the case of a plain deviation from the organic law.

"The courts may declare legislative enactments unconstitutional and void in some cases, but not because the judicial power is superior in degree and dignity to the legislative. Being required to declare what the law is in the cases which come before them, they must enforce the Constitution as a paramount law, whenever a legislative enactment comes in conflict with it. But the court sits, not to review or revise the legislative action, but to enforce the legislative will; and it is only where they find that the Legislature has failed to keep within its constitutional limits that they are at liberty to disregard its action; and in doing so, they only do what every private citizen may do in respect to the mandates of the courts when the judges assume to act and to render judgments or decrees without jurisdiction." Cooley on Con. Lim. (6th Ed.), p. 192.

"In exercising this high authority, the judges claim no judicial supremacy; they are only the administrators of the public will. If an act of the Legislature is held void, it is not because the judges have any control over the legislative power, but because the act is forbidden by the Constitution, and because the will of the people, which is therein declared, is paramount to that of their representatives expressed in any law." See *Lindsay* v. *Commissioners*, 2 Bay, 38, 61; *People* v. *Rucker*, 5 Colo. 455.

Reading the Constitution of the State in the light of the decisions of eminent courts which we have consulted we feel warranted in the following conclusions:

That in the courts created by the Constitution, there is an inherent power of self-defence and self-preservation; that this power may be regulated but cannot be destroyed, or so far diminished as to be rendered ineffectual by legislative enactment; that it is a power necessarily resident in and to be exercised by the court itself, and that the vice of an act which seeks to deprive the court of this inherent power is not cured by providing for its exercise by a jury; that while the Legislature has the power to regulate the jurisdiction of circuit, county, and corporation courts, it cannot destroy, while it may confine within reasonable bounds, the authority necessary to the exercise of the jurisdiction conferred.

It was suggested in argument that to maintain the position that to entrust juries with the power to punish for contempts would impair the efficiency and dignity of courts, disclosed a want of confidence in that time-honored institution. May it not be said in reply that to take from courts a jurisdiction which they have possessed from their foundation betrays a want of confidence in them wholly unwarranted by experience? The history of this court, and indeed of all the courts of this Commonwealth, shows the jealous care with which they have ever defended and maintained the just authority and respect due to juries as an agency in the administration of justice, but our duty, as we conceive it, requires us not to be less firm in vindicating the rightful authority and power of the courts.

We cannot more properly conclude this opinion than by a quotation from a great English judge: "It is a rule founded on the reason of the common law, that all contempts to the process of the court, to its judges, jurors, officers, and ministers, when acting in the due discharge of their respective duties, whether such contempts be by direct obstruction, or consequentially; that is to say, whether they be by act or writing, are *punishable by the court itself*, and may be abated *instanter* as nuisances to public justice.

"There are those who object to attachments as being contrary, in popular constitutions, to first principles. To this it

may briefly be replied, that they are the first principles, being founded on that which founds government and constitutes law. They are the principles of self-defence; the vindication, not only of the authority, but of the very power of acting in court. It is in vain that the law has the right to act, if there be a power above the law, which has a right to resist; the law would then be but the right of anarchy and the power of contention." Holt on Libel, chap. 9.

Whatever opinion may be entertained of some of his predecessors, Chief Justice Holt was no servile minion of arbitrary power. He was an actor in that great revolution which ended forever in Great Britain the pernicious dogma of the divine right of kings, which first recognized the will of the people as the only rightful source of government, and established the independence of the judiciary as one of the surest bulwarks of free institutions.

The judgment of the Circuit Court is affirmed.

*Affirmed.*