## 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

### THOMAS E. BOORDE v. COMMONWEALTH.

#### November 16, 1922.

1. CONTEMPT—*Insulting Language Addressed to or Published of a Judge.*—
Section 4521 of the Code of 1919, clause 3, authorizes courts or judges
in vacation to punish summarily for contempt "obscene, contemptu-
ous, or insulting language addressed to or published of a judge," etc.
In the instant case the insulting words were not addressed to the
judge personally, but were contained in an address at a public meet-
ing and in a publication in a newspaper.

   *Held:* That if the language in question was contemptuous or insulting,
it fell within this provision.

2. CONSTITUTIONAL LAW—*Freedom of Speech—Contempt.*—The right of free
speech is guaranteed by the Constitution, and must be sacredly
guarded, but its abuse is expressly prohibited by that instrument,
and must not be permitted to destroy or impair the efficiency of the
courts or the public respect therefor and confidence therein. To find
the line where the right of free speech ends and its abuse begins is
not always an easy task. In contempt proceedings, this line must
usually be defined by the courts themselves, and in such cases its
location is to be established with especial care and caution.

3. CONTEMPT—*Criticism of Judge allowing his Sons to Practice before Him—
Freedom of Speech—Case at Bar.*—A criticism in good faith of the
practice of a judge of presiding over cases in which his sons were
counsel, without imputing to the judge conscious and intentional bias
and improper judgments in specific cases, is within the constitutional
right of free speech. The alleged practice involves a question of
judicial ethics and propriety about which fair-minded men may and
do differ.

4. CONTEMPT—*Freedom of Speech—Description of Judge as a "Wet Judge,"
together with Criticism for Allowing his Sons to Practice before Him.*—
A charge by respondent that a judge was a "wet judge," and that
for this reason, as well as because his sons were counsel for the ac-
cused in the class of cases to which respondent referred, the judge
rendered unfair judgments, was contempt under the third clause of
section 4521 of the Code of 1919.

5. APPEAL AND ERROR—*Weight to which Finding of Lower Court is Entitled
where Evidence is Oral.*—Where the judge of a lower court hears the

40

evidence, he is in a better position than 'the appellate court to pass upon the facts, and his decision must be accorded very great weight.

6. CONTEMPT—*Charge that Official is "Wet" or "Dry."*—To say that a man is either "wet" or "dry" does not necessarily imply a reference to the probity of his character. Those terms are often used to designate the respective opinions which men entertain as to the wisdom and efficacy of the prohibition laws. In this sense a perfectly upright man may be either wet or dry, and merely designating him as such carries no necessary reflection upon his character. But when it is said that a particular official is not doing his sworn duty because he is wet or because he is dry, there is no escape from the inference of an insulting charge.

7. CONTEMPT—*Criticism of Judge for Allowing his Sons to Practice before Him.*—An imputation upon the character of a judge must have been intended when it was alleged that justice could not be expected from the judge in cases in which his sons were counsel.

8. CONTEMPT—*Criticism of Judge's Decisions—Past and Future Decisions.*—An attack upon a judge for his decisions in liquor cases necessarily related, not merely to past decisions, but also to similar cases which would be tried by him in the future. The apparent purpose of the attack was to influence his action in such cases, and its natural tendency was to embarrass him in the free and independent exercise of his judgment. Considerable latitude is permissbile in the criticism of judicial decisions already rendered, but when such criticism necessarily involves the future action of the court in pending causes, a stricter rule, for obvious reasons, must be applied.

9. CONTEMPT—*Disclaimer—Unambiguous Language.*—Where an attack upon a judge as being a "wet judge" and allowing his sons to practice before him in liquor cases, in the light of the connection and the circumstances under which it was said, was not susceptible of any doubtful interpretation, its general tone being unmistakably contemptuous and insulting, respondent's disclaimer of any intention to insult the court or the judge is unavailing.

Error to a judgment of the Circuit Court of Bedford county.

· *Affirmed.*

The opinion states the case.

*Aubrey E. Strode*, for the plaintiff in error.

*John R. Saunders, Attorney General, J. D. Hank, Jr., Assistant Attorney General*, and *Leon M. Bazile, Second Assistant Attorney General*, for the Commonwealth.

KELLY, P., delivered the opinion of the court.

This is a summary proceeding for contempt instituted by rule against Thomas E. Boorde, charging him with responsibility for "contemptuous and insulting language published of and concerning" Judge P. H. Dillard of the Circuit Court of Bedford county, "for and in respect to proceedings had and to be had in such court."

Judge Dillard was so situated as to render it improper in his opinion for him to hear the matter, and Hon. R. Carter Scott, of the tenth judicial circuit, was designated by the Governor to try the case. The defendant filed an answer in writing, and Judge Scott, upon consideration of the rule and answer and the evidence adduced before him, was of opinion that the defendant was guilty of contempt, and imposed upon him a fine of twenty-five dollars and the costs of the prosecution.

The Virginia Bill of Rights (Constitution 1902, sec. 12) provides that "The freedom of the press is one of the greatest bulwarks of liberty and can never be restrained but by despotic governments; and any citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right."

Section 63 of the Constitution authorizes the General Assembly to "regulate the exercise by the courts of the right to punish for contempt."

[1] Section 4521 of the Code of 1919 authorizes the courts or judges thereof in vacation to punish summarily for contempt in several classes of cases, of which the third class is material to be noted here and is as follows:

"Third. Obscene, contemptuous or insulting language addressed to or published of a judge for or in respect of any act or proceeding had or to be had in such

court, or like language used in his presence and intended for his hearing for or in respect of such act or proceeding."

The revisors, in a note to the foregoing section of the Code say: "The words 'or published of,' found in line two of the third subdivision are new and their insertion changes the holding in *Yoder* v. *Commonwealth*, 107 Va. pp. 831-2, 57 S. E. 581." It is conceded that the instant case, if the language of the respondent was contemptuous or insulting, falls within the provisions of section 4521 above quoted, and that the revisors' note aforesaid correctly states the legal effect of that section as applicable to the case.

No question of procedure or of the admission or exclusion of evidence is involved, the sole inquiry before us being whether upon the rule, answer and evidence the trial judge was warranted in finding the defendant guilty of contempt. In other words, the question is this: Did the defendant merely exercise his right to freely speak and publish his sentiments, or did he abuse that right by speaking and publishing contemptuous or insulting language of a judge of one of the courts of this Commonwealth regarding an act or proceeding had or to be had in such court?

[2] We approach the consideration and decision of this question with a due sense as well of its delicacy as of its importance. The right of free speech is guaranteed by the Constitution and must be sacredly guarded, but its abuse is expressly prohibited by that instrument, and must not be permitted to destroy or impair the efficiency of the courts or the public respect therefor and confidence therein. To find the line where the right of free speech ends and its abuse begins is not always an easy task. In contempt proceedings, this line must usually be defined by the courts themselves, and in such

cases its location is to be established with especial care and caution.  That the courts of this State have scrupulously endeavored on the one hand to avoid abusing the trust thus vested in them, and on the other hand to faithfully and fearlessly administer it, is perfectly clear from the official reports of the leading cases on that subject. . See *Commonwealth* v. *Dandridge*, 2 Va. Cas. (4 Va.) 408; *Elam* v. *Commonwealth* (Prentis, J., Circuit Court of Norfolk county), 4 Va. Law Reg. 520; *Carter's Case*, 96 Va. 791, 32 S. E. 780; *Burdett's Case*, 103 Va. 838, 48 S. E. 878, 68 L. R. A. 251, 106 Am. St. Rep. 916; *Yoder's Case*, 107 Va. 823, 57 S. E. 581.

The situation is admirably summed up by Judge Keith in *Burdett's Case, supra,* as follows:   "There is a reasonable jealousy felt by the public with respect to the exercise of the summary power to punish for contempt.   Especially is this true as to contempts which consist in 'scandalizing the court.'   There is a natural apprehension that personal considerations may influence and bias the judgment of the court.   It is indeed a delicate matter and one with respect to which the courts should act with the utmost caution and reserve.   That they have done this in this Commonwealth its judicial history fully proves.   But while the duty is a delicate one, it is one which cannot be shirked, and the faithful discharge of it is essential to the administration of justice.   The courts are the courts of the people; the judges are the servants of the people; and it is their highest duty to the people to see that the streams of justice are kept pure and uncontaminated.   If the charges brought in the article which constitutes the contempt in this case are true, then the judge of the county court of Nelson county deserves the scorn of all good men.   In defaming him, the county court and justice as therein administered were brought into utter disrepute."

The rule in the case before us charged, among other things, that the defendant, "on or about the 27th day of July, 1921, before a large concourse of people at Hunting Creek church, in the county of Bedford, and while the Baptist Strawberry Association was in session, published of the judge of this court for and in respect to acts and proceedings had and to be had in this court, the following contemptuous and insulting language:

" 'Brave revenue officers risk their lives right here in Bedford county only to have the law evaders whom they have taken such efforts to catch acquitted by a wet judge.  I am speaking of judge P. H. Dillard, and in case any of his friends are present, or should he hear what I say today, my name is T. E. Boorde.  Commonwealth's Attorney Landon Lowry claims that he cannot get convictions.  You may have your own opinion of Landon Lowry, and I shall not seek to change it, but how can we even expect a judge (referring to the judge of this court) to give fair decisions in cases where his two sons make a practice of defending alleged culprits?' "

And further, the rule charged that "in a communication to the editor of the Lynchburg News, a newspaper published in the city of Lynchburg, Virginia, under date of July 28, 1921, and which was published in said Lynchburg News on July 29, 1921, the said T. E. Boorde, referring to said statements made at said Hunting Creek church, used the following language:

"I know that law must be administered with a touch of mercy, but it appears to me that in our courts that there is more mercy than is commensurate with justice. So far as my opinion goes of Mr. Lowry (referring to Landon Lowry, Commonwealth's attorney of Bedford county), he is doing more than he is given credit for. How can we expect a judge (referring to the judge of

this court) to give fair decisions in cases where his two sons make a practice of defending the alleged culprits?' ''.

In his answer to the rule the defendant denies that he used the words "wet judge," or any words of similar import, as applying to Judge Dillard, and then says with respect to his statements at the Baptist Strawberry Association on the 27th day of July, 1921:

"A more accurate report of what respondent then and there said is as follows:

" 'Right here in Bedford county brave revenue officers risk their lives to have the law evaders brought to justice only to have them acquitted or discharged by the judge after having been convicted by a competent jury.

" 'It is not saying anything unkind of Judge Dillard to say that so long as he has two sons practicing on these cases we can hardly expect justice.

" 'Concerning Mr. Lowry, I have had conversation with him concerning these cases. You may have your own opinion of Landon Lowry, and I am not seeking to change that, but I do say that he is doing more than he is given credit for doing in these cases. If the convictions secured by him were not set aside conditions would be different.

" 'I am speaking of Judge Dillard, and in case any of his friends are present, or should he hear what I said today, my name is T. E. Boorde.' ''

The answer admits the accuracy of the quotation in the rule from the communication to the Lynchburg News.

The respondent in his answer disclaims any intention whatever to insult the court or the judge thereof at any time by the language admitted to have been used by him, and disclaims any purpose to bring the court into contempt, or to impugn the integrity or to bring into

disrepute the motives of the judge.    Proceeding further, the respondent insists that he was sincere in his express disclaimer of unkindness to the judge; that he felt constrained as a citizen and minister of the gospel to call public attention to lawless conditions in Bedford county; that he conceived it to be his right as a citizen to express the opinion that it does not tend to promote the ends of justice for a judge to preside over cases in which his sons are counsel; that he acted from pure motives, impelled by conditions against which he had the right to protest; that since January, 1921, he had been pastor of a field of four churches, two of which are in Bedford county, and that for about two years he had been a resident of that county; that during that time he has deemed it his duty to co-operate with other citizens in law enforcement, and particularly, because of its moral aspects and relation to the welfare of his congregation, he has earnestly supported the enforcement of the prohibition law; that during the then current year the circuit court had shown a steadily growing tendency to suspend the execution of jail sentences in prohibition cases where the defendants had been found guilty, notwithstanding the objection to such course by the Commonwealth's attorney; that shortly before he used the language involved in this prosecution a number of prohibition cases had been tried in the said court in which one or more of the sons of the judge of the circuit court were counsel for the defendants, and in one of which cases a verdict of guilty carrying a fine of $200.00 and twelve months imprisonment in jail was set aside, and in others of which the execution of the jail sentence was suspended during good behavior.    The answer then concludes as follows:

"Respondent, along with many other citizens of the county, became gravely apprehensive that the practice

of suspending such sentences would tend to slacken the efforts of the law enforcement officers. He honestly believed that the judge of the court was misusing the discretion confided to him, that he was mistaken in going counter to the recommendations of the attorney for the Commonwealth in such cases, and that possibly the fact that three of his sons made a practice of representing such defendants in his court tended to bias his judgment, though respondent here again expressly disclaims any intention to impugn the integrity or motives of the said judge. Respondent but thought of him as of other fathers and of that in the human heart which inclines one to his own however strong the resolution otherwise.

"In the light of that situation and moved by the considerations hereinabove set out, with no purpose to bring the court into contempt, but only desiring in the interest of the public good to bring about, if possible, through avenues and influences of publicity, a correction of the conditions which he conceived tended to encourage lawlessness, respondent made the utterances herein admitted."

The most marked conflict in the evidence at the trial upon any question of fact was as to whether the respondent used the expression "wet judge" as applicable to Judge Dillard; but there was also very material evidence tending to show that the language in the rule, rather than that asserted in the answer, as to Judge Dillard's sons, was in fact used by respondent.

In an interesting and able presentation of this case for the respondent, his counsel in the brief and in the oral argument took this position: "Upon the whole evidence it is submitted that the preponderance thereof shows that petitioner did not intend the term "wet judge" to be applied to the judge of the circuit court

of Bedford county, leaving the gravamen of his offending, if it be an offense, to lie in the expression of his opinion honestly entertained that a judge could not be expected to give fair decisions in cases where his sons make a practice of defending the accused. The petitioner uttered this criticism in entire good faith and with no intent either to impugn the integrity of the judge or to question his motives appears from his said answers, from his testimony at the trial and from the newspaper publications introduced in evidence by the Commonwealth."

[3] If we could agree with the learned counsel in his conclusions from the evidence, we would have no difficulty in sustaining his contention that the law of the case entitles the respondent to a dismissal of the rule. If the respondent did not apply the terms above quoted to Judge Dillard, and merely made a criticism in good faith of his alleged practice of presiding over cases in which his sons were counsel, without imputing to him conscious and intentional bias and improper judgments in specific cases, he would have been within his constitutional right of free speech. The practice alleged involves a question of judicial ethics and propriety about which fair minded men may and do differ, and which, too, by some people may be honestly and fairly regarded as affecting public confidence in the administration of justice. It may be and probably is true that a distinction between a fair criticism of this character and a charge of conscious wrongdoing is narrow, but the distinction exists and must be recognized. In view of the high character which the trial judges of this State are known to possess, they are perhaps more likely in their rulings to lean against than in favor of counsel nearly related to them. This, however, is also a mere matter of opinion about which the public may

differ, and the subject is one upon which people have a right to form and express their own opinions.

[4, 5] But we are unable to agree that the evidence in this case leaves even a reasonable doubt as to the purpose of the respondent to charge that Judge Dillard was a "wet judge," and that for this reason, as well as because his sons were counsel for the accused in the class of cases to which respondent referred, the judge rendered corrupt judgments.   Judge Scott, who heard the evidence, manifestly reached this conclusion. He was in a better position than we are to pass upon the facts, and his decision thereon must, under settled and familiar principles, be accorded very great weight. But independent of that consideration, the evidence fully satisfies us that his conclusion was sound.

[6, 7] Assuming for the moment that the respondent did refer to Judge Dillard as a "wet judge," we must regard the connection in which these words, as well as the admitted reference to his sons as counsel, were used. That is to say, they must be regarded in the light of and in connection with the charge that justice in Judge Dillard's court could not be expected.   To say that a man is either "wet" or "dry" does not necessarily imply a reference to the probity of his character.   Those terms are often used to designate the respective opinions which men entertain as to the wisdom and efficacy of the prohibition laws.   In this sense a perfectly upright man may be either wet or dry, and merely designating him as such carries no necessary reflection upon his character.   But when it is said that a particular official is not doing his sworn duty because he is wet or because he is dry, there is no escape from the inference of an insulting charge.   So, too, it is clear that an imputation upon character must be intended when it is said, under the circumstances and in the setting sur-

rounding the language used by the respondent in this case, that justice cannot be expected from a judge in cases in which his sons are counsel.

As already indicated, there is some substantial conflict of evidence as to what the respondent said in regard to Judge Dillard's sons as counsel for the accused in prohibition cases and its suggested effect upon his judgments. If that conflict could be overlooked, or resolved in respondent's favor, there would still remain this question: Did he in the same connection refer to Judge Dillard as a "wet judge," and did he use that expression contemptuously? We think the evidence shows that he did.

The witness, Mrs. Yancey, testified that she attended the Strawberry Association and heard the respondent's address on that occasion. Upon being asked to tell the court what he said, she answered: "I think, as I remember, Mr. Boorde said, 'Brave revenue officers risk their lives right here in Bedford county only to have the law evaders acquitted by a wet judge. How can we expect to get justice when he has two sons defending the law evaders?' "

Another witness, L. A. McNellie, testified that he made some notes of the address and reported the same to the Lynchburg newspaper. He did not claim to have in his notes or to have exactly understood just what the respondent said with regard to Judge Dillard, but testified in substance that he reported to the newspaper at once from his then fresh recollection that the appellation "wet judge" was used, and that he thought that report was correct. He saw the published report the next day and discovered no errors in it.

Victor Nichols, the clerk of the court, heard the address and testified that he was not positive but thought the respondent referred to Judge Dillard (calling him

Judge Doody as hereinafter explained) as a wet judge.

Two witnesses, Dr. McFarland and Horace Wilkinson, did not recall that the appellation in question was used in reference to Judge Dillard; but the former heard the respondent refer .to Judge Doody as a wet judge, and the latter (Wilkinson) did not hear all of the address.

The respondent testified that he did not intend to, and in fact did not, apply the term in question to Judge Dillard.

If the evidence stopped here, we might well doubt whether Judge Scott would or should have found against the respondent upon this question of fact. But the express and implied admissions of the respondent himself seem to show conclusively that he intended to describe Judge Dillard to his audience as a wet judge and in an offensive and insulting sense. In the course of his testimony this appears:

"Q. Something was said in reference to Judge Doody whose name you used instead of Judge Dillard?

"A. My wife spoke to me and said you used the wrong name, Judge Doody's name, and I remembered then that I had, because I had connection with Judge Doody. The similarity of the name was what confused me, it was not in my mind to use that term in reference to Judge Dillard, and when my wife told me I had made a mistake, I immediately raised to my feet and said that I had used the wrong name, *confused Dillard with Doody for a whiskey judge in Pennsylvania.*

\* \* \* \* \* \*

"Q. Mr. Boorde, you made some reference that you were thinking of a judge of that kind in Penn.?

"A. I was referring to my connection with that judge; that I had come in connection with a judge that way, and *I did speak of Judge Doody as a whiskey judge.*

"Q. As a judge of that kind?

"A. Because of my relationships with him of that kind, it was in connection to the temperance movement that I came in connection with Judge Doody of Pennsylvania, *and we were speaking of whiskey cases and a whiskey judge, or a wet judge.*

"Q. What was your idea when you got up to explain that you meant Judge Dillard instead of Judge Doody; why did you at the same time use Judge Doody's name as being a whiskey judge?

"A. Because of the connection which I had, in coming in touch with Judge Doody, and usually in cases of this kind." (Italics added).

It further appears that the report of the respondent's address in the Lynchburg paper, published the next day, was headed in big type or headlines thus: "A WET JUDGE ACQUITS EVERYBODY IN BEDFORD." The respondent saw this report, which also contained some reference to the connection of Mr. Landon Lowry, Commonwealth's attorney, with the prohibition prosecutions in Bedford county, and he thereupon got into communication by long distance telephone with Mr. Carter Glass, Jr., associate editor of the newspaper, and, without any reference whatever to Judge Dillard, said he wished to correct the statement in regard to Mr. Lowry. He published a statement subsequently in the paper in which he again failed to make any disclaimer or correction in regard to what he was reported to have said about Judge Dillard.

From these facts, taken along with the other evidence, we think it clear that the language in question was used by the respondent, and that this language, as well as admitted references to the connection of Judge Dillard's sons with prohibition cases, was intended as a reflection upon the judge's integrity and honesty in the trial of such cases.

[8] Furthermore, it is to be observed that the attack upon Judge Dillard necessarily related not merely to past decisions, but also and particularly to a class of cases which would be tried by him in the future.   Its apparent purpose was to influence his action in such cases, and its natural tendency was to embarrass him in the free and independent exercise of his judgment. Considerable latitude is permissible in the criticism of judicial decisions already rendered, but when such criticism necessarily involves the future action of the court in pending causes, a stricter rule, for obvious reasons, must be applied.

[9] The respondent's disclaimer in the original answer and in his testimony cannot avail anything in the face of the evidence as a whole.   What he said, in the light of the connection and the circumstances under which he said it, is not susceptible of any doubtful interpretation.   Its general tone is unmistakably contemptuous and insulting.

In *Carter's Case*, 96 Va. 791, 802, 32 S. E. 780, 45 L. R. A. 310, this court said: "It is true that with respect to conduct or language where the intent with which a thing is said or done gives color and character to the act or words, a disclaimer of any purpose to be guilty of a contempt or to destroy or impair the authority due to the court is a good defense (Rapalje on Contempt, section 115); but this is true only of language or acts of doubtful import and which may reasonably bear two constructions." This rule as to the effect of a disclaimer in contempt proceedings is obviously sound and entirely capable of standing alone; but, if reference to authority be deemed requisite, see, in addition to *Carter's Case, supra; People* v. *Wilson*, 64 Ill. 195, 16 Am. Rep. 528; *In re Chartz*, 29 Nev. 110, 85 Pac. 352, 124 Am. St. Rep. 915, 5 L. R. A. (N. S.) 916; 13 Corpus

Juris 45; 7 Am. & Eng. Ency. L. (2d ed.), 75; Note 9 L. R. A. (N. S.) 1120, 1121.

We are of opinion that the judgment complained of was plainly right and must be affirmed.

*Affirmed.*