PEOPLE *v.* DOE.

*In re* NELSON.

WITNESSES—CONTEMPT—ATTORNEY AND CLIENT—GRAND JURY.
On certiorari to review an order of a circuit judge acting as a one-man jury under Act No. 196, Pub. Acts 1917, as amended by Act No. 395, Pub. Acts 1921, committing plaintiff, an attorney, to prison for contempt for testifying falsely in regard to matters claimed to have been disclosed to him by a client, after raising the question of privilege, the order is affirmed by a divided court.

Certiorari to Berrien; Dingeman (Harry J.), J.,

presiding. Submitted October 25, 1923. (Docket No. 82.) Decided January 7, 1924.

Walter M. Nelson was adjudged guilty of contempt of court, and sentenced to confinement for 30 days in the county jail. Affirmed by an equally divided court.

*Dilley, Souter & Dilley* (*Harry L. Diehl*, of counsel), for appellant.

*Andrew B. Dougherty*, Attorney General, and *Homer H. Quay*, Assistant Attorney General, for appellee.

MOORE, J. A writ of certiorari was issued in this case to review the proceedings had before Hon. Harry J. Dingeman, circuit judge, sitting as a one-man grand jury in a John Doe proceeding under Act No. 196, Pub. Acts 1917, as amended by Act No. 395, Pub. Acts 1921 (Comp. Laws Supp. 1922, § 15664 [2]), pending before him in Berrien county in sentencing plaintiff, Walter M. Nelson, to the county jail for 30 days.

In the return to the writ the following statement occurs:

"Respondent further shows that it being evident to the court from petitioner's own testimony that he had deliberately falsified and that he had been evasive and that his conduct throughout the inquiry was designed to obstruct justice, respondent therefore committed petitioner to the county jail at Berrien county for a period of 30 days for contempt of court."

The following contentions are made by plaintiff and are argued by counsel:

(1) That the statute is unconstitutional which creates the one-man grand jury.
(2) That there was no contempt.
(3) That respondent erred in finding relator falsified his testimony.
(4) That a jury trial was necessary.

(5) That respondent sitting as a grand jury could not punish for contempt.

In our view of the case a disposition of the second of these contentions will make it unnecessary to discuss the other propositions.

The plaintiff is a graduate of the law department of the Michigan University and has had charge of a good deal of litigation with the House of David so-called, at Benton Harbor, or some of its members. Some of the litigation was against the plaintiff and other persons named as defendants. It is said there were more than ten of these cases pending when the officials of the State decided to have a grand jury inquiry into the condition at Benton Harbor.

The plaintiff in obedience to a subpœna attended as a witness. Early in his examination the following occurred:

"*Q.* Well, now, at that conference, Mr. Nelson, you stated did you not, that there was a young lady whose name I don't think was disclosed that was somewhere in Ohio at that time, that could furnish information upon which to base a criminal warrant against Purnell for having carnal knowledge of a female child under the age of sixteen years?

"*A.* No, I don't know that I said that.

"*Q.* Didn't you express the opinion that you had a girl that could give that information?

"*A.* Well, now you see you are asking now for information about a client of mine, and I have definite instructions from this client. All that I know about that client I learned in the relation of attorney and client, and I am obliged to plead privilege as to anything I know about her.

"*Q.* Well, did you state she was a client of yours? Have you any suit pending for her?

"*A.* Now, I don't know which one you mean. The girls that I had in mind, and those I had in mind that evening—I don't remember all that conversation, but the persons that I represent that have any knowledge such as you refer to are clients, and pleadings are either filed or drafted for all of them."

We again quote:

"*Q.* Let me ask you this, Mr. Nelson: What is your reason for not wishing to disclose the name of the girl in Ohio that you thought possibly would furnish this information that we desire, the information upon which to base a statutory charge within the statute of limitations against Benjamin Purnell?

"*A.* Well, there are a lot of reasons, and I would be willing — I really wouldn't want to give them to you because—I can give you some of them. One of them is, I represent her as her lawyer and she has a civil claim.

"*Q.* One you say that could furnish the information?

"*A.* Yes."

The officials were not content with this statement of Mr. Nelson and required him to attend the sessions of the grand jury upon at least three different days, and to submit to an examination that covers more than 70 pages of the printed record. It ought to be stated in fairness to Mr. Nelson that he claims that any apparent inconsistency in his testimony was due to the fact that either the examiner did not understand him or he did not understand the examiner.

Whether Mr. Nelson was guilty of contempt of court will depend upon whether his answers to various inquiries directed to him by the attorney general's department, and by the judge sitting as a grand jury, were privileged because they came to him professionally from his client or clients. The question of privileged communication has had the attention of this court many times. Some of the cases are *Alderman* v. *People,* 4 Mich. 414 (69 Am. Dec. 321); *Riley* v. *Conner,* 79 Mich. 497; *People* v. *Hillhouse,* 80 Mich. 580; *Erickson* v. *Railway Co.,* 93 Mich. 414; *Lorimer* v. *Lorimer,* 124 Mich. at p. 637, and cases cited; *Ford* v. *McLane,* 131 Mich. 371; *Mack* v. *Sharp,* 138 Mich. 448 (5 Ann. Cas. 109); *People* v. *Dahrooge,* 173 Mich. 375; *Devich* v. *Dick,* 177 Mich. 173.

In *People* v. *Dahrooge, supra,* Justice BROOKE said in part:

"This court has frequently held that confidential communications between attorney and client are not to be revealed at any time. *Erickson* v. *Railway Co.,* 93 Mich. 414; *Mack* v. *Sharp,* 138 Mich. 448 (5 Ann. Cas. 109); *Lorimer* v. *Lorimer,* 124 Mich. 631. See, also, cases cited in *Lorimer* v. *Lorimer, supra;* 40 Cyc. p. 2361, and cases cited in note 81."

In *Devich* v. *Dick, supra,* Chief Justice STEERE said in part:

"Exception to the court's refusal to allow defendant to show previous contradictory claims of plaintiff relates to rulings made in sustaining objections to certain questions asked plaintiff on cross-examination touching communications between defendant's counsel, who was conducting the examination, and plaintiff at a time prior to the commencement of this action, when plaintiff and his wife visited said counsel's office, to consult him in regard to this case and to engage his professional services. Counsel stated to the court that plaintiff then made a statement of facts, to which he listened; that he there declined to take the case and was not retained; that he proposed to show that plaintiff then made 'contradictory statements.' Objection to this line of inquiry was sustained on the ground that such communications were privileged. We are of opinion that such testimony was rightly rejected. It clearly appeared that plaintiff visited counsel at his office before this action was brought to consult him professionally and retain his services. The communications then made, and which counsel sought to disclose, were made during a conference for the purpose of establishing the relation of attorney and client in this very case. Tentatively and until counsel declined to take the case, such relation did exist. The communication related to matters in which the professional services of counsel were desired and asked.

" 'If a person in respect to his business affairs or troubles of any kind, consults with an attorney in his professional capacity,

with the view to obtaining professional advice or assistance and the attorney voluntarily permits or acquiesces in such consultation, then the professional employment must be regarded as established, and the communication made by the client or advice given by the attorney under such circumstances, is privileged. * * * It is the consultation between the attorney and the client which is privileged and must ever remain so, even though the attorney after hearing the preliminary statement, should decline to be retained further in the cause, or the client, after hearing the attorney's advice, should decline to further employ him.' 10 Enc. of Ev. 228.

"See, also, *Foster* v. *Hall*, 12 Pick. (Mass.) 89 (22 Am. Dec. 400); *State* v. *Tally*, 102 Ala. 25 (15 South. 722).

"It is not essential to such relation that any fee be paid, promised, or charged, and such communications are privileged, even though the attorney who was consulted and not retained, as claimed in this case, accepts employment from the party adverse to the person making the communications. *Mack* v. *Sharp*, 138 Mich. 448 (5 Ann. Cas. 109); *Cross* v. *Riggins*, 50 Mo. 335."

It is pertinent to inquire how Mr. Nelson could know that some girl in Ohio or anywhere else could give "information upon which to base a criminal warrant against Purnell for having carnal knowledge of a female child under the age of sixteen years" unless he had been told by some one having that knowledge. Mr. Nelson over and over again stated that such information as he possessed upon that subject came to him professionally from a client or clients, and that he was not at liberty to disclose it. A careful reading of this voluminous record leads irresistibly to the conclusion that the entire examination of Mr. Nelson was for the purpose of getting information upon which to base a criminal complaint and warrant and that he at all times was claiming that such information as he possessed was privileged.

The order committing Mr. Nelson for contempt is

not justified by this record and it should be set aside, without costs, and Mr. Nelson discharged.

McDONALD, BIRD, and SHARPE, JJ., concurred with MOORE, J.

FELLOWS, J. I do not think the question of privileged communications is involved in this case. The plaintiff in certiorari was not committed for refusing to answer questions but was committed for answering questions falsely and evasively. As stated by Justice MOORE, the return of Judge Dingeman to this writ contains the following:

"Respondent further shows that it being evident to the court from petitioner's own testimony that he had deliberately falsified and that he had been evasive and that his conduct throughout the inquiry was designed to obstruct justice, respondent therefore committed petitioner to the county jail at Berrien county for a period of 30 days for contempt of court."

That the commitment was for this reason was made clear by the circuit judge to counsel for plaintiff in certiorari when he asked that bail be fixed. He then said:

"*The Court:* This is not a commitment for refusing to answer questions, Mr. Souter. If it were, I would not hesitate to fix bail and give you a chance to review my action. This is a commitment for contempt of court for deliberate falsifying and conduct unbecoming an officer of this court. I don't feel under the circumstances that I ought to do anything further than I have done. As I say, if it were a commitment for refusing to answer some questions and Mr. Nelson had claimed privilege, I would be glad to give you an opportunity to go to the Supreme Court."

The return must be taken as true. In this certiorari proceeding we are not the triers of the facts. We do not weigh the testimony. We may and it is our duty to examine the testimony to see if there is

any evidence to support the finding.    If there is we can not measure it.    The finding must be accepted as true.    This is settled law.

As stated by Justice MOORE, the examination of Mr. Nelson was extended and I shall quote but a few excerpts from it to demonstrate that there was evidence to sustain the finding.    I shall first take some excerpts from his testimony upon the first examination:

"*Q.* Do you remember that I got you by telephone and you said that you had just arrived and that you hadn't had lunch?

"*A.* Well, that is about right.

"*Q.* And I went over to your office and waited until you returned from lunch, and asked you with reference to the young lady that you had told us lived in Ohio, and requested that you accompany me, if you would, and see this—interview this young lady?

"*A.* Yes, this is substantially right, the way I remember it now.    *    *    *

"*Q.* You feel, Mr. Nelson, that on account of these people being your clients, that you should not disclose to us the names of the parties that you know we are liable to get the information from?

"*A.* Yes, I feel under that absolute obligation.    I asked them the last time I saw each one separately if they were willing to testify if they would come over here and aid this thing.    I told them if they would do this, I certainly wouldn't put anything in their way, and there wasn't a one of them willing to do it, and everyone of them instructed me definitely just as I am acting now of their own volition.    As far as I am concerned, I would be relieved of a good many things if I could get the thing off my hands.

"*The Court:* They are not all clients, are they?

"*A.* The witnesses, the ones you want, the only ones that are any good to the State in this case are clients. There are only three girls.    *    *    *

"*Q.* Will you give us the last known address of the Bamford sisters?

"*A.* 1816 Spruce street is the last one I know.

"*Q.* Both?

"*A.* Yes, because Rubel lived there and Mrs. Reed came from Pennsylvania there.

"*Q.* Will you give us the name of the girl and the town, this girl that lived in Ohio?

"*A.* I can't do that.

"*Q.* Couldn't you give us her name?

"*A.* No, I didn't know it at the time I told you. All I knew was, she had moved. I told you that, Mr. Quay, that I couldn't go and get her. I had my hand bag there and just laid it down in my office, and you asked me to pick it up and go. I told you that I couldn't do it."

When Mr. Nelson appeared the last time he gave the following testimony:

"*Q.* At that time I believe you were interrogated by me as to a witness, or a young lady, who lived somewhere in the State of Ohio, that might furnish evidence upon which a criminal warrant could be predicated against Benjamin Purnell for the crime of rape, and I think you stated that the young lady referred to was a client of yours. Am I right about that?

"*A.* Well, the young lady I think we had reference to was and is a client, but it seems to me that you have got this Ohio business pretty badly mixed up. I did not appreciate when I was here before what was in your mind at the time. I think I know now, and I think I ought to straighten out any impression you have on that score, because that girl—the girl that Governor Groesbeck referred to, the girl I had in mind and the girl that I thought you had in mind here was Ruth Reed, and that was the girl I had in mind.

"*Q.* Ruth Reed, one of the Bamford girls?

"*A.* Yes, one of the Bamford girls. If you have got the impression that there is an additional girl, why that is a mistaken impression, and I did not realize you had the idea there were three girls instead of just the two; because if you will remember the conversation with Governor Groesbeck, we fixed the age and described the girl and I had reference all the time to Ruth Reed.

"*Q.* Well—

"*A.* (Continuing) Not an additional girl at all."

Considerable further examination was had and Mr. Nelson's attention was challenged to his former testi-

mony and some of it was read, and the following occurred:

"*Q.* Do you still persist in saying, in the face of this record, such portions as I have read, and there are others in it, that when you testified in this proceeding before with reference to a girl in Ohio that you had in mind one of the Bamford girls?

"*A.* Well, I say on portions I think you read that is what I had in mind. Any other portions I have no memory.

"*Q.* She didn't live in Ohio?

"*A.* No, and I didn't mean to say she did.

"*Q.* I am talking about your testimony at the previous hearing, when you referred to the girl in Ohio, when we referred to a girl in Ohio, whether you still persist in saying you had in mind one of the Bamford girls?

"*A.* I had Ruth Reed in mind.

"*Q.* Well, that is one of the Bamford girls?

"*A.* Yes, that is the way I understand it from what has been read. Now, I explained to the court how I understood that, because at the time I went up there I understood that she was to be taken that afternoon to Toledo. I had nothing to do with that. That was not my proceeding. I said to stay right there."

These excerpts alone I think would justify the trial judge in concluding from Mr. Nelson's testimony given on the first occasion that there were three girls who could give testimony incriminating Benjamin Purnell, all of whom were clients of his, two of whom were the Bamford girls for whom he had started suit and both of whose names were known to him, and the other girl living in Ohio whose name he could not give. Upon his last appearance his testimony was that there were not three girls, only the two Bamford girls, that he had reference to one of them, Ruth Reed, who did not live in Ohio but who had temporarily gone to Ohio the afternoon he left Detroit. Manifestly this testimony was out of harmony with that given on the first examination and justified the trial judge in concluding that plaintiff in error had testified falsely.

While these excerpts I have quoted alone sustain the finding there is much more in the record to give it support, and it is possible that this opinion will be better understood if, without further quotation from the record, what it shows is stated. Mr. Nelson and his associate had successfully for their clients prosecuted a case against Purnell and as I understand it the Israelite House of David in the United States district court for the western district of Michigan, and had secured a decree for a substantial amount. The exact sum is not given in the record. Upon the hearing of that case testimony was given of gross immoralities practiced by Purnell upon the girl members of the colony. Each of the Bamford girls, both of whom were married, who had been members of the colony, had through Mr. Nelson and his associate brought suit against Purnell charging seduction and rape. The declarations in their cases were on file and accessible to the public; other suits were also started growing out of the situation at the House of David. Counter suits were started against Nelson and his clients for slander and conspiracy and the public interest was aroused. Acting for the people of the State, the attorney general instituted *quo warranto* proceedings asking for the ousting of, and appointment of a receiver for, the Israelite House of David; he also instituted proceedings in the Berrien county circuit court under Act No. 196, Pub. Acts 1917, as amended by Act No. 395, Pub. Acts 1921 (*Comp. Laws Supp.* 1922, § 15664 [2]). Judge Dingeman of the Wayne circuit court presided. Mr. Nelson's testimony is the only testimony before us, but from it and the record the foregoing facts are made to appear. It is apparent that the attorney general and his associates were attempting to run down and ascertain the truth of the claims of immoralities on the part of Purnell. Mr. Nelson testifies to con-

ferences with the attorney general and his assistants at one of which the governor was present. He did not attempt to withhold from them the facts his clients could testify to nor did he do so as a witness, and quite freely and somewhat in detail voluntarily testified to facts they had communicated to him. It was when asked to give their names and present addresses that he claimed his professional privilege. And I think it should be here stated that Judge Dingeman did not require him to give such names and present addresses; the address of the Bamford girls of 1816 Spruce street was a former address. Mr. Nelson's testimony is convincing that he resented both the proceedings instituted by the attorney general; that for the appointment of a receiver might prejudice the collection of his decree, and that for the discovery of crime might, if indictments were found, make public in advance the facts he relied upon in the litigation he was conducting. And he showed a disposition throughout his examination to treat the scandal of the House of David as his property, and attempts of the State as trespass upon it. Time and again he insisted that he should be left "in control" and that the investigation of public officials should be deferred until he was "in the clear." His testimony on the first examination was to the effect that there were three girls, clients of his who could aid the State; upon the last examination that there were but two. While his inconsistent testimony alone was not sufficient to convict for perjury (*People* v. *McClintic*, 193 Mich. 589 [L. R. A. 1917C, 52]; *People* v. *Kennedy*, 221 Mich. 1), it was sufficient to authorize a finding that he had testified falsely (*Lonier* v. *Savings Bank*, 153 Mich. 253) and that such false testimony tended to the obstruction of the due administration of justice. If this was contempt, it was direct contempt, committed in the face of the court, to be dealt with summarily.

While the authorities are not unanimous, I am persuaded that the great weight of authority is to the effect that false swearing is contempt of court. Upon reason it should be so held. Courts should not be trifled with. A refusal to answer a proper question is beyond question contempt. If so, the refusal to answer truthfully imports greater moral turpitude and should likewise be held to be contempt. Chamberlayne on Evidence, vol. 1, § 249, thus states the rule:

"Of possible acts, few are so antagonistic to the objects of judicial administration as the intentional false swearing which seeks to baffle the search for truth, without which justice is impossible. Such swearing is a flagrant insult to the dignity of the court; and the same offense is committed by an attorney or other person who procures the giving of perjured testimony. The nature of the subject-matter of the false evidence may affect, according to its importance or consequence, the action of the court in awarding punishment. False swearing as to the disposition of property stands in a different position from more important matters. But the offense, regardless of the materiality of the evidence given, may properly be dealt with as a contempt."

The rule thus announced is supported by the following authorities: *In re Ulmer,* 208 Fed. 461; *United States* v. *Appel,* 211 Fed. 495; *In re Steiner,* 195 Fed. 299; *Ex parte Hudgings,* 249 U. S. 378 (39 Sup. Ct. 337, 11 A. L. R. 333); *Berkson* v. *People,* 154 Ill. 81 (39 N. E. 1079); *Riley* v. *Wallace,* 188 Ky. 471 (222 S. W. 1085, 11 A. L. R. 337); *Edwards* v. *Edwards,* 87 N. J. Eq. 546 (100 Atl. 608); 13 C. J. p. 25; 6 R. C. L. p. 497; *In re Rosenberg,* 90 Wis. 581 (63 N. W. 1065, 64 N. W. 299). In the last cited case it was said:

"Whether the petitioner's answers were untruthful, evasive, or prevaricating, so as in effect to amount to a refusal to answer and to give the discovery called for; or whether it was fairly within his ability to make

226—Mich.—2.

the discovery required of him; whether his conduct was innocent or contumacious,—were questions which the exigency of the case required the circuit court to determine. The power to determine is jurisdiction. The correctness or justice of the determination of these questions by the circuit court is not open for consideration here. That determination is conclusive in this proceeding."

That the misconduct constituting contempt may also be indictable does not prevent punishment for contempt, although the court should take such punishment into consideration in imposing sentence in case of conviction (3 Comp. Laws 1915, § 12291). What I have said applies to defendant's contentions (2) and (3) set forth in Mr. Justice MOORE'S opinion but leaves for consideration (1), (4) and (5). I shall consider them in the order named.

1. The objection to the constitutionality of the act under which the examination was held is that it confers non-judicial duties on circuit judges. This objection is answered by the case of *Mundy* v. *McDonald,* 216 Mich. 444 (20 A. L. R. 398), where we said:

"That defendant acted in a judicial capacity cannot, we think, be questioned. What he did, he did as a circuit judge."

4. The claim of plaintiff in error that he was entitled to a trial by a jury is likewise answered by a former decision of this court. *In re Chadwick,* 109 Mich. 588. In that case Mr. Justice GRANT, speaking for the court, said:

"Proceedings for contempt are not criminal causes within the intent and meaning of the Constitution of the United States or of this State. If they were, then the party accused of contempt would be entitled to a jury trial. Our own Constitution provides that 'circuit courts shall have original jurisdiction in all matters, civil and criminal, not excepted in this Constitution and not prohibited by law.' Article 6, §

8.   It also provides that 'in every criminal prosecution the accused shall have the right to a speedy and public trial by an impartial jury.'     Article 6, § 28. We are not aware of any decision under a constitution similar to ours holding that one accused of contempt is entitled to a jury trial.     It is apparent that this power should be lodged in the court.     It is repugnant to all ideas of propriety to say that a jury should determine whether an act committed, or statement made in the presence of the court or outside it was insulting and degrading to the court itself, and tended to obstruct the due course of justice.     The authorities are nearly uniform that the court must determine the question.     Such has been the uniform practice in the courts of this State.     'Cases of contempt of court were never triable by jury, and the object of the power would be defeated in many cases if they were.     The power to punish contempts summarily is incident to courts of law and equity.' Cooley, Const. Lim. (4th Ed.) 394, note 2.     The judicial department is entirely distinct from the legislative, and the Constitution leaves this power existing in the court as it was at the common law."

5. The objection to the power to punish for contempt is in part answered by *Mundy* v. *McDonald, supra,* but it is further insisted that the act in question makes provisions for punishment for contempt in certain cases and it is urged that this is to the exclusion of the power to punish in any other cases. The power to punish for contempt is inherent in the court.   It is a part of the judicial power.   It is as firmly vested in the constitutional courts by the Constitution as is the exercise of any other judicial power. That the exercise of the judicial power and all of it can not be taken away from constitutional courts by the legislature is settled.   The question is fully considered in *Nichols* v. *Judge of Superior Court,* 130 Mich. 187.   See, also, *In re Chadwick, supra; Carter* v. *Commonwealth,* 96 Va. 791 (32 S. E. 780, 45 L. R. A. 310) ; *Bradley* v. *State,* 111 Ga. 168 (36 S. E. 630, 50 L. R. A. 691, 78 Am. St. Rep. 157) ; *State* v.

*Woodfin,* 27 N. C. 199 (42 Am. Dec. 161) ; *Fisher* v. *McDaniel,* 9 Wyo. 457 (64 Pac. 1056, 87 Am. St. Rep. 971).

I think the writ of certiorari should be dismissed and the order of Judge Dingeman affirmed.

CLARK, C. J., and STEERE and WIEST, JJ., concurred with FELLOWS, J.