*In re* HARTLEY.

CONTEMPT—ONE-MAN GRAND JURY PROCEEDING—EQUALLY DIVIDED COURT.

Order holding witness at so-called one-man grand jury proceeding in contempt for false and evasive answers and sentencing him to serve 60 days in county jail is affirmed by an equally divided court (3 Comp. Laws 1929, §§ 17217–17220).

Habeas corpus by William F. Dohany on behalf of Leo Hartley with accompanying certiorari to George B. Hartrick, Oakland Circuit Judge, to obtain his release from Oakland County Jail. Submitted January 7, 1947. (Calendar No. 43,540.) Writ dismissed April 17, 1947 by an equally divided court.*

*William F. Dohany,* for plaintiff.

*Eugene F. Black,* Attorney General and *Edward J. Fallon,* Special Assistant Attorney General, for defendant.

DETHMERS, J.   The Honorable George B. Hartrick is one of the circuit judges of the sixth judicial circuit duly assigned to conduct, under the provisions of 3 Comp. Laws of 1929, §§ 17217 to 17220 (Stat. Ann. §§ 28.943 to 28.946), a so-called one-man grand jury investigation of alleged gambling and corruption of public officials in Oakland county.

---

* See, also, *In re Oliver*, 318 Mich. 7, reversed on certiorari by Supreme Court of the United States, March 8, 1948.—REPORTER.

In the course of the investigation it was discovered that the plaintiff, Leo Hartley, was the owner of certain pinball machines operated throughout the county of Oakland, which were suspected of having been used for gambling purposes. It was further discovered that one C. A. Mitchell, doing business under the registered, assumed name of Midwest Bonding Company, had sold to Hartley a number of "bonds," a specimen of which reads as follows:

"EXHIBIT 'A'

"MIDWEST BONDING COMPANY

"(Operating and existing under and by virtue of the Laws of the State of Michigan, Act No. 101, Pub. Acts 1907.)

"BOND TO GUARANTEE LEGAL PERFORMANCE

"Know all men by these presents, that Midwest Bonding Company hereinafter designated as 'company' is hereby held and firmly bound unto Oakland county, Michigan, in a sum not to exceed $200 lawful money of the United States of America.

"The condition of this obligation is such, that the said company agrees to reimburse said Oakland county, Michigan, for all moneys expended as actual costs to prosecute and convict any person or persons violating the conditions hereinafter set forth under paragraphs (a), (b), (c) and (d); said costs shall not exceed the sum above set forth; it being hereby expressly understood and agreed that upon a conviction being had for any default in this bond that this obligation shall terminate and be null and void in so far as any subsequent violation is concerned.

"Paragraph (a) The company warrants that the certain skill game machine bearing 'Midwest tag No. ............:' owned by .......... located on the premises of ........... at ........... will not be played or operated by any person or persons who have not attained the age of 18 years.

"(b) That no player of said machine shall receive any prize, reward or gain from or on account of having played said machine.

"(c) That no player, while playing said machine, shall enter into any agreement or wager to receive any prize, reward or gain from the results obtained.

"(d) That said machine shall be operated and played for amusement and skill purposes only.

"This bond shall take effect at 12 o'clock noon of the 1st day of September A.D. 1945 and continue in effect until 12 o'clock noon of the 1st day of September 1946 unless cancelled prior thereto as above provided for its automatic termination, or by written notice delivered to Oakland county, Michigan, and such cancellation shall be without prejudice to any claim originating prior thereto.

Midwest Bonding Company<br>By C. A. Mitchell"

Judge Hartrick examined the bonds, deemed them worthless and illegal, and suspected that Mitchell had in that connection obtained money under false pretenses. Hartley was thereupon subpoenaed before the grand jury and questioned concerning his purchase of the bonds. He gave answers which, in the opinion of Judge Hartrick, were false and evasive. Stating that he was acting not only in the capacity of grand jury, but as circuit judge, the judge thereupon adjudged Hartley in contempt of court and sentenced him to serve 60 days in the county jail.

Plaintiff has filed a petition for a writ of habeas corpus and ancillary writ of certiorari. He urges that his sentence for contempt and subsequent detention are illegal because:

1. Due process of law under both the Federal and State Constitutions requires the filing of charges, a notice to the accused and a hearing in all contempt cases not committed in open court.

2. It is a denial of due process of law for a judge summarily to adjudge one guilty of contempt of court upon the basis of alleged false swearing, ex-

cept where the court has personal knowledge of the falsity of the testimony.

3. A one-man grand jury does not act as a court; therefore, contemptuous misbehavior toward a grand juror is not a direct contempt of court and is not punishable summarily.

4. The plaintiff was not in fact guilty of contempt of court.

The first three grounds may appropriately be considered together as all three are directed to the same general question of the right of the judge, under the circumstances here presented, to summarily adjudge one guilty of contempt without filing of charges, notice and hearing thereon.

In conducting a so-called one-man grand jury investigation, a circuit judge acts in a judicial capacity. *Mundy* v. *McDonald,* 216 Mich. 444 (20 A. L. R. 398); *In re Slattery,* 310 Mich. 458 (certiorari denied, 325 U. S. 876 [65 Sup. Ct. 1553, 89 L. Ed. 1993]). This Court has previously upheld the power of a circuit judge, acting as a one-man grand jury, to punish summarily for contempt. *People* v. *Wolfson,* 264 Mich. 409; *In re Cohen,* 295 Mich. 748. See, also, *In re Slattery, supra,* and cases cited therein (467). While, in the *Slattery Case,* the judge adjourned the one-man grand jury proceeding and then reconvened as a circuit court before adjudging the witness guilty of contempt, in effect he was still acting as the grand jury. He made an adjudication based on his personal knowledge of what had transpired before him as a one-man grand jury. No record of the pertinent grand jury proceedings was transcribed and presented to him as a circuit judge. That, we held, would have been an idle gesture. It would be an equally idle gesture to require such adjournment of the grand jury and its reconvening as a circuit court. The circuit judge, while acting as a one-man grand jury may, in appropriate

cases, summarily adjudge a witness testifying before him guilty of contempt and impose sentence forthwith.

Plaintiff's contempt, if any, was committed in the face of the court and required no extraneous proofs as to its occurrence. It was direct and there was, therefore, no necessity for filing of charges, notice to accused and hearing as provided in 3 Comp. Laws 1929, § 13912 (Stat. Ann. § 27.513). It was properly dealt with summarily. 3 Comp. Laws 1929, §§ 13910, 13911 (Stat. Ann. §§ 27.511, 27.512).

"A circuit judge may take cognizance of his own knowledge of contempts committed during the sitting of the court, and in its 'immediate view and presence;' and may proceed to punish summarily persons guilty of such contempts, basing his action entirely upon his own knowledge." *In re Wood* (syllabus), 82 Mich. 75.

Was plaintiff, in fact, guilty of contempt? As aptly stated in defendant's brief:

"A mere glance at exhibit A promptly challenges the attention of anyone to its total lack of value and to its purpose. For instance, the so-called bond does not run to petitioner. It affords him no protection whatever. His name nowhere appears in it. It would be physically impossible for Mitchell to perform the 'warranties' contained therein.

"Yet when called as a witness to explain his purchase of the bonds and his investigation of their legality, he answered as follows."

There follows portions of plaintiff's testimony, included in defendant's return to the writ of certiorari, of which we deem pertinent here the following:

"*Q.* Did you know Carman Mitchell prior to the time he approached you to sell you these bonds?

"*A.* I didn't know, only met him. I had met him a couple of times. I didn't know him to speak to.

\* \* \*

"*Q.* Did you notice the name of the bonding agency on the bond?

"*A.* I didn't pay any particular attention to the name until you gentlemen explained to me in court. I noticed Midwest. He told me Midwest, but I don't believe I made the check out to Midwest.

"*Q.* Didn't you investigate the Midwest Bonding Company to see who was operating it?

"*A.* No.

"*Q.* Did you ask Mitchell who was operating it?

"*A.* I didn't ask him who was operating it.

"*Q.* Didn't you care?

"*A.* Why, I should have investigated, but—

\* \* \*

"*Q.* But you never went to the prosecutor's office or any lawyer in private practice, to have these bonds examined, did you?

"*A.* No, I didn't.

"*Q.* You knew, Mr. Hartley, that he had no way of protecting you or your machines when you gave him this money, didn't you?

"*A.* Well, I didn't, I didn't know too much about it, the only thing the other fellows had bought them and just seemed like the thing to do to buy them.

"*Q.* Do you want us to understand that you just gave him the, this money each time you gave it without knowing what you were giving it to him for? Now, wasn't it a fact, Mr. Hartley, that you were afraid if you didn't buy these bonds or give Mitchell this money, something would happen to your machines?

"*A.* It isn't that I was afraid something would happen to them, but different times that I know, in 1937 we had games, we had to take them out because they ruled against them, or something.

"*Q.* Well, did you think when you gave Mitchell this money he could keep your machines in operation for you?

"*A.* No, it was that, it was to, well anything that would like it would keep them in operation, not that they were illegal or something, but always trying to pass laws, one thing and another, but the main reason I bought them was because other operators had got them and the big operators, so I thought it was the thing for me to do.   *   *   *

"*Q.* Now, as a matter of fact, you were afraid if you didn't give Mitchell this money that something would happen to your machines?

"*A.* No, I wouldn't.

"*Q.* Well, how did you think he, as an ordinary individual, would give you any protection on your machines?

"*A.* Why, I don't know he [how?] he could give me as an ordinary individual, but I bought the bonds, he gave the bonds to me to reimburse the county for expenses. It sounded all right to me. I should had [have?] had them checked.

"*Q.* You said something about the law changing, or the law affecting your pin ball machines. Now, how did you think Mitchell could alter that law or keep it from being enforced?

"*A.* Well, that never entered my mind about that. *   *   *

"*Q.* You knew your machines were legal didn't you?

"*A.* Yes.

"*Q.* You had an absolute right to operate them?

"*A.* That is right.

"*Q.* Just how did you think you needed any help from Mitchell?

"*A.* Well, the only reason I bought them is because, because I thought that these other fellows bought them and they usually know more about [that?] than I do.

"*Q.* Well, do you want us to think you did it because, just because somebody else did?

"*A.* Well that is one reason I bought them. That is the main reason, and the other is I thought the bonding company must be a good thing, or he was

a bondsman, and I didn't know what it was all about.
*   *   *

"*Q.* Did Mitchell explain to you that the bonds would protect the county in case somebody put the machines to an illegal use?

"*A.* He read the bond to me and the bond, the way it read to reimburse the county for, if they had to prosecute cases. I don't know. *   *   *

"*Q.* Didn't it occur to you to consult any official of the county?

"*A.* No, because I asked the other operators and they had bought them, so I thought it must be all right.

"*Q.* Why would you consult the other operators in preference to county officials?

"*A.* Well, they are the ones that bought them.
*   *   *

"*Q.* Did you ever hear of anyone else in your life writing a bond which would protect a county or agree to reimburse a county for any expense arising out of a prosecution?

"*A.* No. *   *   *

"*Judge Hartrick:* Your story, Mr. Hartley, isn't the story of a reasonable man, a reasonable man of your obvious powers of comprehension. You didn't buy the bonds offhand when the man asked you to, you made an investigation, and then you haven't given us a very satisfactory story of that investigation, what was said, and you haven't given us a logical man's statement of why you parted with the money, and you have all the appearances, to me you have all the appearances of a very intelligent, comprehensive witness, that is capable of understanding business and business transactions, and I don't believe you claim any incapacity along that line, do you?

"*A.* No."

In its return to the writ of certiorari the court stated that it had found and determined that plaintiff had given false and evasive answers concerning

matters material to the grand jury inquiry and
was, accordingly, guilty of contempt of court. As
stated in the case of *In re Slattery, supra,* page 477:

"The law is stated by Mr. Justice FELLOWS, speak-
ing for the Court in *People* v. *Doe,* 226 Mich. 5:
" 'The return must be taken as true. In this cer-
tiorari proceeding we are not the triers of the facts.
We do not weigh the testimony. We may and it is
our duty to examine the testimony to see if there is
any evidence to support the finding. If there is we
can not measure it. The finding must be accepted
as true. This is settled law.' "

There is abundant evidence to support the finding
of the court. It will be noted from the above testi-
mony that plaintiff did not know Mitchell well
enough to speak to, that he made no investigation of
Midwest Bonding Company and no inquiry as to
who was operating it. Yet he gave Mitchell money
for bonds which on their face were worthless.
When pressed to state his reasons for parting with
good money for such so-called bonds, his first ex-
planation was that he "didn't know too much about
it," then it was because "the other fellows had
bought them," and then it "just seemed like the
thing to do." At one point he testified that the fact
that other operators had bought bonds was his *main*
reason for doing so; when asked as to his other rea-
sons, which upon further interrogation were made
to appear ludicrous, he claimed that it was his *only*
reason; and finally, when this appeared increasingly
foolish, he claimed it as merely *one* of his reasons.
No more graphic demonstration of frantic flight
from one untenable position to another could be
imagined. Again, he offered as a reason that when
in 1937 he had operated such games, they had been
ruled against, but he immediately followed with the
answer that he did not think Mitchell could prevent

such adverse rulings and thereupon changed his reason, saying that while he considered the operations legal there were always attempts to pass laws against them. When asked later whether he had thought Mitchell could prevent passage of such laws or their enforcement, he testified that such thought had never entered his mind. Plaintiff's next explanation was that he had nursed a fond hope of saving the county harmless against costs incurred in the prosecution of persons playing his machines illegally. Then follows his explanation that he knew his machines were legal, but that he bought the bonds because he thought the bonding company, which he had previously admitted he had not investigated, must be a good thing. Then, amazingly enough, he bought the bonds because he thought Mitchell must be a bondsman. And, finally, he ended in the same vein as he started by saying that he "didn't know what it was all about."

Plaintiff's answers were obvious attempts to fob off inquiry; they were evasive and inconsistent; they reveal a manifest desire and attempt to conceal plaintiff's real reason for purchasing the bonds; they amount to sham, fully as effective in thwarting proper inquiry by the court as an absolute refusal to answer questions at all. In the *Slattery Case* we enunciated the applicable rule by quoting with approval from *United States* v. *Appel,* 211 Fed. 495, 496, the following:

" 'The rule, I think, ought to be this: If the witness' conduct shows beyond any doubt whatever that he is refusing to tell what he knows, he is in contempt of court. That conduct is, of course, beyond question when he flatly refuses to answer, but it may appear in other ways. A court, like any one else who is in earnest, ought not to be put off by transparent sham, and the mere fact that the wit-

ness gives some answer cannot be an absolute test. For instance, it could not be enough for a witness to say that he did not remember where he had slept that night before, if he was sane and sober, or that he could not tell whether he had been married more than a week. If a court is to have any power at all to compel an answer, it must surely have power to compel an answer which is not given to fob off inquiry.' "

Plaintiff was properly adjudged guilty of contempt of court and sentenced therefor. Petitions for habeas corpus and certiorari are dismissed and petitioner is remanded to the custody of the Oakland county sheriff to serve the remainder of his sentence or until the same shall have been commuted or suspended by the circuit judge, as provided by law.

CARR, C. J., and BUSHNELL and SHARPE, JJ., concurred with DETHMERS, J.

BOYLES, J. I am unable to concur in affirming the judgment of contempt and the ·sentence therefor. The writ of habeas corpus together with an ancillary writ of certiorari were issued on the filing of plaintiff's petition; and at the inception of these proceedings plaintiff was released from custody on bail. The return to the ancillary writ of certiorari fails completely to support the finding that Hartley gave false or evasive answers. There is no claim that Hartley was contemptuous in his manner or demeanor in the grand-jury room.

The testimony Hartley gave before the grand jury is set forth in full by Mr. Justice DETHMERS, together with the finding announced by the grand juror at its conclusion. According to the return, this occurred in the grand-jury room late in the evening of September 11, 1946. Hartley was without counsel. The

grand juror then and there summarily sentenced Hartley to 60 days in the county jail for alleged contempt of court, and Hartley was forthwith confined. The order adjudging contempt and the commitment therefor was not formally made and entered until September 14th, due, as the grand juror returns, to his being stricken with illness and removed to a hospital. William F. Dohany, who appears here as attorney for Hartley, and on whose petition in behalf of Hartley this proceeding was brought, has filed an affidavit—which is in the record—subscribed and sworn to on September 14, 1946, stating as follows:

"That your affiant has been refused permission to talk to the said prisoner by order of the sheriff and the judges of the Oakland county circuit court.

"That your affiant has made diligent search and inquiry as to the cause of confinement of said Leo Hartley but has been unable to find any legal record of said commitment."

Nowhere in the record or the return is there a denial of the truth of the foregoing statements, or an explanation as to why Hartley was denied the benefit of counsel as late as the third day after his confinement began. I agree, as stated by Mr. Justice FELLOWS in *People* v. *Doe,* 226 Mich. 5, and repeated in *Re Slattery,* 310 Mich. 458, that it is our duty to examine the testimony only to see if there is any evidence to support the finding of contempt. I am not able to infer from the testimony, as quoted by Mr. Justice DETHMERS, that Hartley was giving evasive or false answers, as found by the sentencing grand juror. The *Slattery Case* is no precedent for such a finding or conclusion in the instant case. In that case there was considerable foundation to lead to the conclusion that Slattery was giving false, or

at least evasive, answers when he repeatedly answered "I don't remember" to questions quite obviously within recent memory, and of recent occurrence. The facts and circumstances in the *Slattery Case* have little resemblance to those in the record now before us. Slattery repeatedly answered "I don't remember" to questions which were quite obviously within his memory. In the instant case Hartley answered every question asked him, at least in so far as the record here discloses. The answers he gave were just as compatible with the truth as otherwise. Nothing in this record warrants any other conclusion. There may have been other testimony or other circumstances within the knowledge of the grand juror which impelled him to a different conclusion. If so, it does not appear in this record. We have nothing here to show that Hartley was a lawyer, or above the average in legal skill or knowledge. We have nothing to show how much Hartley paid for the bond or bonds in question. It is apparent that the so-called "bond" shown in the record might be confusing to a layman. The bonds were worthless, a conclusion easily reached when given consideration by a lawyer, but it is fully compatible with the truth that Hartley, as he testified, was induced to pay for them by the knowledge that the other "big operators" had gotten them, that he bought the bonds to reimburse the county for expenses, and that "it sounded all right" to him. The investigation was concerning gambling, bribery of public officers, and it is not claimed that the seller of the so-called "bonds" was under investigation for obtaining money under false pretenses.

Inasmuch as the record does not contain any evidence tending to support the finding of evasiveness or untruthfulness in the answers given by plaintiff, the order of his commitment under which he tech-

nically is still in custody should be hereby vacated, plaintiff released, and his bond cancelled. Our order herein should be certified to the circuit court of Oakland county.

BUTZEL, REID, and NORTH, JJ., concurred with BOYLES, J.