## In re OLIVER.

Contempt—Equally Divided Court.

In habeas corpus proceeding in behalf of person sentenced to jail for contempt for giving false and evasive answers to one-man grand jury investigating alleged violations of statutes relating to gambling and bribery of public officials, petition is dismissed and person found in contempt ordered to serve sentence by an equally divided court (3 Comp. Laws 1929, § 17217 et seq.).

Habeas corpus by William F. Dohany on behalf of William Oliver with accompanying certiorari to George B. Hartrick, Oakland Circuit Judge, to obtain his release from Oakland county jail. Submitted January 7, 1947. (Calendar No. 43,539.)

Writ dismissed May 16, 1947 by an equally divided court. Reversed on certiorari by Supreme Court of the United States March 8, 1948.

*William F. Dohany,* for plaintiff.

*Eugene F. Black,* Attorney General, and *Edward J. Fallon,* Special Assistant Attorney General, for defendant.

CARR, C. J. On September 11, 1946, and prior thereto, an investigation was being conducted in the county of Oakland by the Hon. George B. Hartrick, one of the circuit judges of said county, pursuant to the provisions of 3 Comp. Laws 1929, § 17217 *et seq.* (Stat. Ann. § 28.943 *et seq.*). The subject matter of such investigation involved alleged violations of the statutes of the State pertaining to gambling, operation of gambling devices, bribery of public officials, and other offenses. On the date referred to William Oliver was summoned before Judge Hartrick and questioned concerning certain matters pertaining to the inquiry. During such examination the other circuit judges of Oakland county, the Hon. Frank L. Doty and Hon. H. Russel Holland, sat with Judge Hartrick in an advisory capacity. At the conclusion of Oliver's testimony the judges unanimously agreed that false and evasive answers had been given by Oliver in answer to questions. Thereupon Judge Hartrick adjudged Oliver guilty of contempt of court and sentenced him to 60 days in the Oakland county jail.

Following the conviction and sentence a petition was filed in this Court on behalf of Oliver, asking for a writ of habeas corpus, with accompanying writ of certiorari, to inquire into the legality of his conviction, sentence and imprisonment. On the fil-

ing of said petition the writs were issued, and Oliver, herein referred to for the sake of clarity and brevity as the plaintiff, was released on bail. The matter is before this Court on the petition and Judge Hartrick's return.

The return sets forth that, in the course of the investigation referred to, it was called to the attention of the circuit judge, acting as a grand juror, that plaintiff was the owner of certain pin ball machines which were being operated in Oakland county, and which, it was suspected, were being used for gambling purposes; and that plaintiff had purchased from one C. A. Mitchell, doing business as the Midwest Bonding Company, a series of instruments referred to as "bonds," for which plaintiff had paid Mitchell certain sums of money. The return further shows that Oliver was questioned before the grand jury concerning his dealings with Mitchell, and also as to the location of the bonds in question. The testimony that Judge Hartrick and his associates concluded was false and evasive is as follows:

"*Q.* Now, in September of 1944 you were approached by a man named Carman A. or Carman E. Mitchell with reference to the purchase of certain bonds which were to cover pin ball machines that were owned and operated by you in the county of Oakland, that is right?

"*A.* Yes.

"*Q.* Where are those bonds now?

"*A.* Well, I destroyed them.

"*Q.* When?

"*A.* Well, I don't remember the exact date. I imagine I destroyed it at the end of the year. You know, when going through my papers I didn't see any use for keeping them because they had expired.

"*Q.* What method did you use to destroy them?

"*A.* Well, I don't know offhand just what I did

do with them, whether I burned them or threw them out. I must have threw them out.

"*Q.* Did you ever buy any bonds of that kind before?

"*A.* No.

"*Q.* Never had any of that kind of bonds in your possession before in your lifetime?

"*A.* No, I never did.

"*Q.* You never had an event of that kind occur in all your life did you?

"*A.* No.

"*Q.* And you want us now to understand, even in view of the fact that those were the only bonds of this type that you ever owned or handled, you want us to believe that you cannot tell us now what method you employed in destroying them?

"*A.* I just got rid of them. I imagine I threw them in the waste paper basket. That is what I usually do. I get lots of circulations, papers, things that I have no use whatever for, threw them in the waste paper basket.

"*Q.* When do you think you threw them away?

"*A.* Possibly the end of the year, found them in there, run out, expired.

"*Q.* The closest thing to accuracy that you can give us regarding those bonds, is that you are not sure when you destroyed them, are not sure what method you employed to destroy them?

"*A.* The only—I couldn't say what I did do. Probably threw them in the trash can.

"*Q.* That is as close as you can tell us?

"*A.* No, no, I don't remember what I did do with them. I can't say positive what I did do with them.

"*Q.* Where were you when C. A. Mitchell first talked to you about the purchase of these bonds?

"*A.* Well, to the best of my memory I was in his office.   *   *   *

"*Q.* Who mentioned these bonds first, you or he?

"*A.* He did.

"*Q.* What did he tell you about them?

"*A.* Oh, he just handed me one, told me to look it over.

"*Q.* Did you look it over?

"*A.* Yes.

"*Q.* Did you read it?

"*A.* Yes.

"*Q.* What next was said?

"*A.* Well, he went ahead to explain to me about the bonds, you know, what it was for.

"*Q.* What did he tell you it was for?

"*A.* To reimburse the county for any expense, extra expense they had to go to in case the machines, anybody was caught gambling on the machines or anything illegal.

"*Q.* Your machines are perfectly legal, are they not?

"*A.* They were, yes.

"*Q.* Did he tell you who he was going to prevent from using that gambling device?

"*A.* He didn't tell.

"*Q.* Didn't you ask? You know, according to the ruling they can be gambled on?

"*Q.* You know people go in and bet on high scores things like that?

"*Q.* Did Mitchell mention that to you before you bought them?

"*A.* Well, he stressed upon if the county had to go to any expense, extra expense, the bonding company would pay the expense.

"*Q.* Did you consult the prosecuting attorney about it?

"*A.* No, I didn't.

"*Q.* You knew the county was involved, did you not?

"*A.* Well, yes.

"*Q.* Didn't you think it was any of the county's business that some stranger was making a contract for the county?

"*A.* No, I didn't think anything special about it. * * *

"*Q.* Did you have any conversation with anybody else about these bonds before you bought them?

"*A.* Yes, I spoke to McNamara about it.

"*Q.* McNamara is now dead is he not?

"*A.* Yes.

"*Q.* Who else?

"*A.* I spoke to Hartley about it.

"*Q.* What conversation did you have with Hartley?

"*A.* Well, I asked him what he thought about it. He said, well, he didn't know. He said McNamara had an attorney and was going to see the prosecutor about them. He said he was going to wait and see what information he got before he did anything.

"*Q.* You went to Hartley and asked him what he thought?

"*A.* I went to him or called him up, I don't know which. Anyway I discussed it.  *  *  *

"*Q.* What protection did you think you were getting out of this transaction?

"*A.* Well, you know, they just hand down a ruling that the machines in some places are illegal, if they caught them gambling on them, things like that. I figured it would show our good faith, we were trying to run them legitimately.

"*Q.* How did you think C. A. Mitchell could enforce the law as far as your machines were concerned?

"*A.* I don't know. He didn't say 'Enforce the law, show our good faith.' We had a little sticker we put on the machines.  *  *  *

"*Q.* You didn't seek any advice from Mr. Dohany before you parted with your money, or in relation to these bonds, did you?

"*A.* No."

In the brief filed on behalf of plaintiff it is contended, first, that plaintiff's summary conviction of contempt constituted a denial of due process of law

and, hence, violated article 2, § 16, of the State Constitution, and section 1 of the Fourteenth Amendment to the Federal Constitution; second, that due process of law, under both the State and Federal Constitutions, required the filing of charges, notice of hearing to the accused, and a hearing on such charges; third, that contemptuous misbehavior toward a grand jury conducting an investigation under the statutory provisions above cited is not contempt of court. These questions were all raised in the case of *In re Hartley,* 317 Mich. 441; in which the conviction of Hartley for contempt, committed under circumstances analogous to those in the case at bar, was sustained by an evenly divided court. They were discussed at some length by Justice DETHMERS in his opinion, and it is unnecessary to repeat what was there said. The claims made are without merit.

This brings us to the consideration of the question whether, as a matter of fact, plaintiff was guilty of contempt of court. The return of the circuit judge as to the facts must be taken as true. This Court does not weigh the testimony but examines it to determine if there is evidence to support the finding. *People* v. *Doe,* 226 Mich. 5; *In re Slattery,* 310 Mich. 458 (certiorari denied 325 U. S. 876 [65 Sup. Ct. 1553, 89 L. Ed. 1993]). An examination of the testimony given by Oliver with reference to his dealings with Mitchell leads to the conclusion that plaintiff sought to withhold his real reason, or reasons, for paying money to Mitchell, ostensibly for the bonds. No copies of these instruments appear in the record in the instant case, but the return of the circuit judge states that he was satisfied, after investigation, that the instruments were the same as those sold by Mitchell to Hartley. It may be noted in this connection that an affidavit,

set forth in the record, filed by plaintiff in support of a motion for a more complete return, sets forth that said plaintiff in his testimony before the grand jury identified a duplicate of a bond purchased by him from Mitchell. It thus appears that there was testimony before the grand jury with reference to the form of the bonds that plaintiff received from Mitchell. A copy of a bond in the *Hartley Case, supra,* is set forth in the opinion of Justice Dethmers therein.

Plaintiff testified that he read one of the bonds, received by him from Mitchell, but his answers to questions as to why he had purchased them, and what protection he thought he was receiving through them, were vague and uncertain. The grand juror and his associates were fully justified in concluding that Oliver was intentionally evasive. He offered no plausible reason whatsoever for the payments made by him to Mitchell. What was said by Justice Dethmers in the *Hartley Case, supra,* with reference to testimony of Hartley, may well be applied to the statements of Oliver. It is apparent that for some reason he did not wish to disclose to the grand juror the precise nature of his dealings with Mitchell. His evasive replies clearly tended to obstruct the investigation and were in consequence contemptuous in character. It is scarcely conceivable that plaintiff did not know the real reason why he took these so-called bonds from Mitchell, and paid money to the latter.

Judge Hartrick and his associates also concluded that Oliver's answers to questions relating to his disposition of the bonds were likewise false and evasive. He first claimed that he destroyed the instruments, but in answer to further questions was unable to tell when or where or by what means he did so, and finally concluded by stating that he

did not remember what he did with them. Concededly, however, the instruments were of an entirely different character than any that he had ever previously possessed. If, as he at one time suggested in his testimony, he wanted to show his "good faith" in the operation of his machines, it is a reasonable inference that he would have preserved the so-called bonds.

The circuit judges had the advantage of hearing plaintiff's testimony and of noting his demeanor in giving it. The conclusion reached finds support in the record. An order will accordingly enter dismissing the petition and remanding plaintiff to the custody of the sheriff of Oakland county for service of his sentence in accordance with the order of the circuit judge.

BUSHNELL, SHARPE, and DETHMERS, JJ., concurred with CARR, C. J.

NORTH, J. William Oliver, herein designated as plaintiff, in September, 1946, after testifying in a so-called one-man grand jury proceedings conducted by Honorable George B. Hartrick, one of the Oakland county circuit judges, was committed under a 60-day sentence for contempt of court. On plaintiff's petition we issued writs of habeas corpus and certiorari, that we might review and test the validity of his commitment. Pending the appeal he was released on giving bond. The case has been submitted to this Court, and Chief Justice CARR has written for affirmance of the sentence imposed. For reasons hereinafter noted, I am unable to concur in that result.

The proceedings incident to the hearing before the grand juror, including questions propounded to and answers made by plaintiff, adequately appear

in the opinion of the Chief Justice, and therefore are not herein repeated. From that opinion, and also from the record, it clearly appears that the asserted justification for finding plaintiff guilty of contempt was, as stated by the Chief Justice, "that false and evasive answers had been given by Oliver in answer to questions." Hence the scope of our review is this: Is there any competent evidence in the record in support of the finding below that when plaintiff was testifying he gave answers which were (1) evasive or (2) false?

As noted above, the testimony quoted in my Brother's opinion discloses all there is in the record bearing upon the issue as to whether any of plaintiff's answers were evasive. A careful reading of that testimony fails to disclose a single evasive answer, especially when read in connection with the whole of the quoted testimony. Instead each answer was courteous and responsive. It is true that plaintiff was not able to give positive and definite answers to some of the questions. But that circumstance must be viewed in the light of the subject matter of the examination. So far as it was relevant or material, the examination pertained to plaintiff's conversations with one Mitchell through whom plaintiff had purchased so-called bonds * incident to the operation of various pin ball machines in different localities; and to the reason why plaintiff bought the so-called bonds, also the manner in which plaintiff disposed of the bonds after they had expired by their own terms. It is important to note that the bonds were purchased in September, 1944, but plaintiff's testimony involved herein was not given until two years later, September, 1946. Is it at all strange that when testifying in 1946 plaintiff could not give a verbatim or detailed statement of

---

* For copy of bond, see *In re Hartley*, 317 Mich. 441.

quite commonplace conversations which occurred between him and Mitchell in 1944? Again, it was a year after the bonds had expired when plaintiff was interrogated as to what disposition he had made of the then worthless papers. There is no dispute or conflict in the testimony that plaintiff destroyed the bonds or threw them out as waste paper. Can it be said that a witness who is unable to testify definitely as to how he disposed of, for example, an automobile policy that had expired a year previously is thereby shown to be evasive in his testimony or that he is guilty of giving false testimony? If so, many an honest person would hazard being headed for jail whenever summoned as a witness.

So far as appears from the record quoted in my Brother's opinion, plaintiff's testimony as to his reason for purchasing the bonds is true and plausible. Nothing in the record contradicts those answers. The record affords no ground for finding them either false or evasive. Perchance the testimony of this witness was not what the examining grand juror had expected the witness would give, but neither that circumstance nor anything disclosed by this record indicates evasiveness by plaintiff as to conversations with Mitchell or his reasons for purchasing the bonds. Such a record does not justify punishment for contempt.

Likewise as to the charge that plaintiff Oliver gave false testimony and was imprisoned therefore, a diligent review of the record fails to disclose a justification. The return of Judge Hartrick to our writ of certiorari wholly fails to specify any particular answer or answers in plaintiff's testimony that are shown by anything in the record to be false. Instead the return quotes plaintiff's testimony at length, the substance of which is embodied

in the opinion herein of the Chief Justice. The return leaves it to this reviewing Court to guess which of plaintiff's answers were, in the opinion of the circuit judge, false. Such a return is not adequate nor is it fair to the person charged. Both he and we are entitled to be specifically informed of the claimed falsity, so that the issue may be accurately reviewed by this Court and so that plaintiff may purge himself of the contempt, if he finds occasion so to do. At no time has the circuit judge informed plaintiff (or this Court) of the precise portion of plaintiff's testimony that was deemed to be false. Instead at the close of plaintiff's examination the judge merely announced: "Because the story (plaintiff's testimony) doesn't, if you want it put in language you understand, doesn't jell. * * * I don't think any one person who reads your testimony, reads this record, could believe this story." The character of the return in the instant case quite clearly discloses a lack of justification for punishment of plaintiff on the ground that he gave false testimony.

In a case of this character the record is fatally defective as to the charge of falsifying, unless it contains other facts or circumstances which reveal falsity or unless the testimony of the witness intrinsically discloses falsity. It is not sufficient that a judge may have knowledge *dehors* the record which might justify the conclusion that the witness gave false testimony. That is the fatal defect in the instant record as to this phase of the case. On the record before us there is no justification for concluding that plaintiff's answers or any of them were false as against the opposite conclusion—*i.e.*, that his answers were true. Hence the circuit judge's conclusion as to falsity is without justification in this record, and plaintiff should not have

been committed for contempt on the ground of assumed falsification. If the circuit judge had a suspicion that plaintiff was testifying falsely, he might well have done as the court did in *State* v. *Meese*, 200 Wis. 454, 463 (225 N. W. 746, 229 N. W. 31), where it is stated:

"The court, however, was suspicious that the witness was not telling the truth, and on his own motion subpoenaed witnesses and ordered production of books and papers to determine the truth or falsity of the defendant's testimony. He found that the defendant did not testify truthfully, and that because thereof he had obstructed justice."

Had the above practice been pursued in the instant case a record might or might not have been made which would have disclosed justification for a contempt commitment. But on the record before us a determination in accord with that of the circuit judge would be based on pure guess or merest conjecture. Such a record does not justify punishment for contempt of court on the grounds asserted in the instant case, in which the record is not at all comparable to that *In re Slattery,* 310 Mich. 458 (certiorari denied 325 U. S. 876 [65 Sup. Ct. 1553, 89 L. Ed. 1993]). The distinction is sufficiently pointed out in the opinion of Mr. Justice BOYLES *In re Hartley,* 317 Mich. 441.

"On certiorari the Supreme Court reviews questions of law and determines only whether there was evidence of any facts which justify findings of the trial judge." *In re Gilliland* (syllabus), 284 Mich. 604.

Contempt proceedings are criminal in their nature rather than civil. *Riegler* v. *Kalamazoo Circuit Judge,* 222 Mich. 421, citing *Carnahan* v. *Carnahan,* 143 Mich. 390 (114 Am. St. Rep. 660, 8 Ann. Cas. 53). It is said *In re D. Levy & Co.,* 73 C. C. A. 558 (142 Fed. 442):

"We are not unmindful of the general rule that the power to imprison for contempt in such cases should be exercised with great caution, and only upon proof which establishes the facts found beyond a reasonable doubt, or which must, in any event, be clear and convincing."

The Supreme Court of Wisconsin has said:

"The power to punish for contempt is to be used but sparingly. It should not be used arbitrarily, capriciously, or oppressively." *State* v. *Meese, supra* 458.

In *United States, ex rel. Paleais,* v. *Moore* (C. C. A.), 294 Fed. 852, a headnote reads:

"The power to punish for contempt, being far-reaching and drastic should always be exercised cautiously, and with due regard to constitutional rights."

On the record before us, which does not contain testimony by plaintiff which was evasive or which showed he falsified, our conclusion is that plaintiff was unjustly committed for contempt of court; and for that reason the judgment entered in the circuit court should be vacated and plaintiff's bond released.

BUTZEL, BOYLES, and REID, JJ., concurred with NORTH, J.